In re NEW HAMPSHIRE ELECTRIC COOPERATIVE, INC., Debtor.

In re EUA POWER CORP., Debtor.

In re BANKEAST CORP., Debtor.

Bankruptcy Nos. 91–11336, 91–10525 and 90–11981.

United States Bankruptcy Court, D. New Hampshire.

Sept. 21, 1992.

See also 138 B.R. 668.

Daniel Cohn, Cohn, Roitman & Kelakos, Boston, Mass., for debtor in No. 91–11336, and R.W. Beck & Associates, Power System Engineering, Inc., CNS Xenergy, Inc., CNS Elec. Systems Consultants, Inc., CNS Deloitte & Touche, Accountants.

Mark W. Dean, Merrill & Broderick, Manchester, N.H., for debtor in No. 91–11336.

Mark T. Broth, Gallagher, Callahan & Gartrell, Concord, N.H., Sp. Labor Counsel for debtor in No. 91–11336.

John C. Ransmeier, Ransmeier & Spellman, Concord, N.H., for Unsecured Creditor's Committee, Nathan Wechsler & Co., CNS.

George J. Marcus, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., for Creditor's Committee, Slater Consulting, CNS.

Anthony C. Marts, Wiggin & Nourie, Manchester, N.H., for Official Member Committee, Tellus Institute, CNS, Branscombe & Associates, CNS.

Robert C. McDiarmid, Spiegel & McDiarmid, Washington, D.C., Sp. Counsel for Regulatory Matters.

Patrick H. Wood, Wescott, Millham & Dyer, Laconia, N.H., Sp. Real Estate Counsel for debtor in No. 91–11336.

Mark W. Vaughn, Devine Millimet, P.A., Manchester, N.H., for State of N.H.

Tierney & Paters, Natick, Mass.

Daniel W. Sklar, Sklar Law Offices, Manchester, N.H., for debtor in No. 90–11981.

Brian P. Leitch, Arnold & Porter, Washington, D.C., J. Christopher Marshall, McLane, Graf, Raulerson & Middleton, Manchester, N.H., Sp. Counsel for debtor in No. 90–11981.

Anthony Mirendea, Foley, Hoag & Eliot, Boston, Mass., for Coopers & Lybrand, accountants to BankEast Corp.

Albert A. Notini, Hale and Dorr, Boston, Mass., for Ernst & Young, accountants for Creditors' Committee.

Steven A. Solomon, Backus, Meyer & Solomon, Manchester, N.H., for Coopers & Lybrand.

Alan Lefkowitz, Dechert, Price & Rhoads, Boston, Mass.

Daniel W. Sklar, Sklar Law Offices, Manchester, N.H.

Steven V. Camerino, Manchester, N.H., Joseph A. Foster, McLane, Graf, Raulerson & Middleton, Manchester, N.H., for DIP.

Daniel M. Glosband, Goodwin, Proctor & Hoar, Boston, Mass., for Canal Elec. Co., NE Power Co., United Illuminating Co.

Noel E. Hanf, Wiggin & Dana, New Haven, Conn., for United Illuminating Co.

Albert A. Notini, Hale and Dorr, Boston, Mass., for Official Bondholders Committee, Frank J. O'Connell, Putnam, Hayes & Bartlett.

Paul M. McDermott, Hale and Dorr, Boston, Mass., M. Douglas Dunn, Milbank, Tweed, Hadley & McCloy, New York City, for Official Bondholders Committee.

Geraldine B. Karonis, Asst. U.S. Trustee, Manchester, N.H.

Gerald Garfield, Day, Berry & Howard, Hartford, Conn., for Connecticut Light & Power Co.

Mark N. Polebaum, Hale and Dorr, Boston, Mass., for Charles River Associates, Richard S. Ruback.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

These cases came on for hearing before the Court on interim fee and expense applications of the parties involved in each matter seeking, *inter alia*, reimbursement of expenses relating to telecopying, word processing, document production, secretarial overtime, and computer-accessed legal research. The Court deferred ruling on these particular expense reimbursement requests pending briefing by the parties and by the United States Trustee.

The specific issue before the Court is whether the particular types of expenses described above constitute reimbursable expenses within the meaning of Section 330(a)(2) of the Bankruptcy Code. For the reasons set forth herein, the Court will deny these specific expense requests, as not being shown to be actual costs and/or not shown to be necessary with the particularity required under § 330(a)(2) of the Code, subject to a limited opportunity to reassert such reimbursement claims at the time of final fee awards, with full documentation of actual costs and the necessity for same prepared by the professionals at no cost to the estate.

## THE STATUTE

Pursuant to Section 330 of the Bankruptcy Code and Bankruptcy Rule 2016, the

Court may allow bankruptcy counsel reimbursement of actual and necessary expenses. Section 330(a)(2) of the Bankruptcy Code provides:

> After notice ... and a hearing, ... the court may award ... to a professional person employed under ... this title, or to the debtor's attorney ... reimbursement for *actual, necessary* expenses. (Emphasis supplied)

11 U.S.C. § 330(a)(2). However, "[s]ection 330 refrains from specifically drawing a line of demarcation between allowable expenses and non-allowable ones, beyond the vague test that expenses must have been necessarily incurred in the performance of the officer's duties." 2 *Collier on Bankruptcy,* ¶ 330.06, p. 330–68 (15th ed. 1992). It should also be noted that § 330(a)(2) dealing with *expenses,* unlike § 330(a)(1) dealing with *fees* of professionals, does not include as a factor to be considered "the cost of comparable services other than in a case under this title."

### THE TRADITIONAL "OVERHEAD" TEST

Generally, bankruptcy courts have held that those expenses that are traditionally considered "overhead" will not be reimbursable expenses. *See e.g. In re Leonard Jed Co.,* 103 B.R. 706 (Bankr.D.Md.1989), *In re Thacker,* 48 B.R. 161 (Bankr.N.D.Ill. 1985), *In re Island Helicopter Corp.,* 53 B.R. 71 (Bankr.E.D.N.Y.1985), *In re Rego Crescent Corp.,* 37 B.R. 1000 (Bankr. E.D.N.Y.1984), *In re Global International Airways Corp.,* 38 B.R. 440 (Bankr. W.D.Mo.1984), *In re Horn & Hardart Baking Co.,* 30 B.R. 938 (Bankr.E.D.Pa.1983). The rationale is that overhead expenses are figured into the attorneys' hourly rates and accordingly recovered in that manner. *See e.g. In re Thacker,* 48 B.R. 161, 164 (Bankr. N.D.Ill.1985) ("The traditional way to spread [overhead] expenses ... is for the firm to structure its hourly rates to take such expenses into consideration."); *In re Stoecker,* 114 B.R. 965, 979 (Bankr.N.D.Ill.

1990) ("Expenses which are overhead are not compensable because they are built into the normal hourly rate charged by the billing professional.") To allow these "overhead" costs to also be recouped from particular clients as reimbursable expenses would basically allow the attorneys to recover these costs twice. *See In re Orthopaedic Technology, Inc.,* 97 B.R. 596 (Bankr.D.Col.1989).

Unfortunately, there is no bright line between overhead expenses and reimbursable expenses. As one bankruptcy court observed, "There exists some disagreement among the courts as to which expenses may be properly charged to the debtor's estate and which are normal overhead expenses included in the firm's billing rates." *In re Jensen–Farley Pictures, Inc.,* 47 B.R. 557, 584 (Bankr.D.Utah 1985); *see also* 2 *Collier on Bankruptcy* ¶ 330.06[3] at p. 330–69 ("[T]here has been a wide divergence of policy among the bankruptcy courts concerning the treatment of costs and expenses that are considered by some courts to be nonreimbursable because they constitute expenses allocable to overhead.") The Office of the United States Trustee nationally has not yet taken a definitive position with regard to which expense items should be included in overhead, and which expense items should be included in the category of reimbursable costs.[1]

### THE LOGICAL PROBLEM

While the traditional "overhead" test provided a bright-line demarcation between reimbursable expenses and nonreimbursable expenses of operating a professional's office, at the time of the enactment of the 1978 Bankruptcy Code, the succeeding dawn of the computer age has rendered that test, as usually formulated, essentially useless when dealing with the question of reimbursable expenses in bankruptcy cases.

The standard case law definition of "overhead" focuses on whether the particu-

---

**1.** Such guidelines I believe could be promulgated by the U.S. Trustee, either regionally or nationally, after appropriate surveys and opportunity for input from affected professionals in both bankruptcy and non-bankruptcy practice. While not ultimately binding on the court they would at least give guidance in terms of the conflicting policies involved as discussed below.

lar expense can be attributed to a particular client or as part of the general operation of the professional office. As stated in *In re Jensen Farley Pictures, Inc.*, 47 B.R. 557, 584 (Bankr.D.Utah C.D.):

> There exists some disagreement amount the courts as to which expenses may be properly charged to the debtor's estate and which are normal overhead expenses included in the firm's billing rates. Overhead, for the purpose of determining reimbursable costs in bankruptcy cases, includes all continuous administrative or general costs or expenses incident to the operation of the firm which cannot be attributed to a particular client or case. The term is not definable with exact precision, but may be exemplified by such items as rent, taxes, insurance, lighting, heating, and other office expenses, including secretarial services.

A somewhat amplified definition along the same lines is set forth in *In re Wildman*, 72 B.R. 700, 731 (Bankr.N.D.Ill.1987):

> Expenses so labeled which are a part of the usual and ordinary expenses of an attorney in practice are not separately reimbursable, for these constitute overhead or cost of doing business and are taken into account in determining the hourly rate. *In re Pacific Express, Inc.*, 56 B.R. 859, 865 (Bankr.E.D.Cal.1985). Overhead, for the purpose of determining reimbursable costs in bankruptcy cases, includes all continuous administrative or general costs or expenses incident to the operation of the firm which cannot be attributed to a particular client or case. *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 584 (Bankr.D.Utah 1985). *See also In re Thacker*, 48 B.R. 161, 164 (Bankr.N.D.Ill.1985) (overhead is those costs incurred by a law firm on a day-to-day basis no matter whom it represents.

A recent survey research report by the American Bankruptcy Institute indicates that the test as provided in these cases "provides little guidance in practice." Am. Bankr.Inst., *American Bankruptcy Institute National Report on Professional Compensation in Bankruptcy Cases*, § 11.2.1, p. 224 (G.R. Warner rep. 1991) (hereinafter cited as "ABI Report").

The basic problem is that in this computer age it is literally possible to attribute essentially all expenses relating to running a professional office to particular clients *if* you spend enough time and effort doing so. Accordingly, the "overhead" factor is tending to disappear into the mists of history involving an earlier age in which red-blooded capitalists actually invested "working capital" into their businesses. Such monies were at risk and were not reimbursable from anyone except through ultimate profits of the enterprise. Not surprisingly, the case reports now include claims in the bankruptcy courts for reimbursement of such things as office rent,[2] office supplies,[3] and air conditioning.[4]

Agreeing that "overhead" is not definable with exact precision, one court stated that, although some courts disallowed reimbursement for various expenses, including word processing and legal computer costs, it was going to allow those costs to be reimbursable due to "the practice within the profession of billing them to regular clients." *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 585 (Bankr.D.Utah 1985). On this point, I disagree with the *Jensen* court. As appropriately stated by the Maryland bankruptcy court, "The Court's response is that merely because these practices are routine does not convert overhead expenses to out of pocket expenses." *In re Leonard Jed Co.*, 103 B.R. 706, 711 (Bankr.D.Md.1989). Accord, *In re Kreidle*, supra, at 576. "The idea that bankruptcy courts should automatically allow reimbursement for expenses which might otherwise be considered overhead just because the profession as a whole suc-

---

**2.** See *In re Miguel*, 123 B.R. 634, 635 (Bankr. E.D.Cal.1991).

**3.** See *In re Kreidle*, 85 B.R. 573, 576 (Bankr. D.Colo.1988).

**4.** See *In re King Resources Company*, 20 B.R. 191, 206 (D.Colo.1982).

ceeds with such creative billing practices is unacceptable to this Court ...*" *Matter of D'Lites of America, Inc.,* 92 B.R. 554, 555 (Bankr.N.D.Ga.1988).[5]  I also agree with the *Leonard Jed* court that there is no authority supporting the proposition that prior allowances of expenses by this Court constitutes the "law of the case", to which this court is bound, and such an assertion is incorrect. *See In re Leonard Jed Co.,* 103 B.R. at 711.

The problem really resolves down to finding some principled basis for drawing a line between reimbursable and nonreimbursable expenses, for Bankruptcy Code purposes, in the absence of any explicit statutory guideline.  The case law development of the "overhead" concept simply is no longer effective due to recent technological progress.  It is difficult to imagine any expenses connected with running a professional office that cannot now be computed to be "attributable to a particular client" if the professional so desires and has a ready cash reimbursement option available from the client.[6]  There simply is a severe logical problem with the current formulation of an appropriate standard.  That problem I believe explains the proliferation of directly contrary views on this question by the various courts.

What is needed in my judgment is a new formulation directed to the real problems facing the Court in trying to draw lines between reimbursable and nonreimbursable expenses for purposes of § 330(a)(2) of the Bankruptcy Code.  This opinion will now discuss those problems seriatim. These problems stem basically from the fact that a number of the expenses now being claimed as reimbursable do not derive from discrete transactions with third party providers that are clearly attributable on their face to the particular client, as was true under the "traditional" non-overhead concept, and stem also from the fact that many of the new types of reimbursements being requested do not easily demonstrate the necessity for the same as compared to other options available.

## THE "ACTUAL COST" PROBLEM

The statute requires that an expense be "actual" before it can be deemed reimbursable.  In "olden times" attorneys and courts talked about "out-of-pocket" expenses as being reimbursable.  The traditional types of expenses prevalent at the time of the enactment of the 1978 Bankruptcy Code were indeed such expenses. The new categories of expense now claimed as reimbursable do not easily evidence their "out-of-pocket" character.  Instead, as is true in the matters presently before this Court, the professionals simply estimate their costs or use a "market rate" that has a built-in profit or mark-up factor for the firm.  This apparently is becoming customary in billing practices by many professional firms.  See *ABI Report,* § 11.2.1, p. 223.

Indeed, the hearings before me demonstrated repeatedly that the professionals involved simply do not know the actual costs of the various services being provided but have merely estimated the same after making sure that the amount claimed is at least as much as what is believed to be the actual cost.[7]  In a sense it would be counterproductive for them to do the detailed work necessary to establish clearly the actual cost of a particular service attributable to the particular client, down to precise dollars and cents, because the effort to so determine the precise amount would be so extensive that when they claimed their hourly charges for professional fees, including that effort, those charges would exceed by a great amount the reimbursement item being claimed and would simply

---

5.  I would only change the word "creative" to "computerized" in that statement.

6.  This is especially so in bankruptcy cases in which the costs of preparation of compensation applications is normally allowable as part of the professional's fee request.

7.  This is not intended to be critical of the professionals involved—it is understandable—they have better things to do with their time.

compound the problem.[8]

The foregoing conundrum demonstrates the dilemma before the Court, i.e., how to determine actual cost expense reimbursements when the "cost of knowing" the actual costs may exceed the requested amount of expense reimbursement. Moreover, bankruptcy courts, particularly at the interim compensation stage, simply do not have time to go into these detailed cost justification questions for professional firms who may have widely differing practices and contract arrangements with their suppliers. The time necessary could easily exceed the time necessary to pass on the much more substantial amounts involved with *fees* where the inquiry is relatively simple since the court can take judicial notice of the case before it.

■ It is of course well-established that expenses reimbursable under § 330(a)(2) cannot include any profit or mark-up factor. As stated in *In re Ginji Corp.*, 117 B.R. 983, 995 (Bankr.D.Nev.1990):

Expenses which are compensable are those fronted by the attorney or law firm on behalf of a particular client. These expenses can only be charged to the bankruptcy estate at the cost to the attorney or law firm. The court will not allow law firms to use such items as a profit-making center.

See also *In re Prairie Central Railway Co.*, 87 B.R. 952 (Bankr.N.D.Ill.E.D.1988):

Actual costs and expenses reasonably and necessarily incurred are reimbursable and subject to allowance by the Court but not in amounts which include any profit or mark up factor to the applicants. Only actual out of pocket expenses are reimbursable under Section 330(a)(2). *In re S.T.N. Enterprises, Inc.*, 70 B.R. 823, 834 (Bankr.D.Vt.1987).

The case decisions repeatedly reaffirm the foregoing and also emphasize that strict documentation of actual costs is required and that "bald assertions" or flat estimated amounts or percentages will not suffice to support reimbursement. See e.g., *In re Bank of New England Corp.*, 134 B.R. 450, 458 (Bankr.D.Mass.1991); *In re Command Services Corp.*, 85 B.R. 230, 234 (Bankr.N.D.N.Y.1988); *In re S.T.N. Enterprises, Inc.*, 70 B.R. 823, 832 (Bankr. D.Vt.1987); *In re Cuisine Magazine, Inc.*, 61 B.R. 210, 218 (Bankr.S.D.N.Y.1986).

While courts can and do repeatedly refer to the exclusion of any profit or mark-up from these new types of "once-removed" out-of-pocket reimbursement claims, the problem persists as to the cost effectiveness of such actual cost determinations if literally enforced in terms of both court time, U.S. Trustee analysis time, and the cost of providing that determination if that process itself is to be compensable from the bankruptcy estate in the hourly fee application of the professional involved.

### THE "NECESSARY" PROBLEM

These new type of expense reimbursement requests raise a unique question regarding the "necessary" factor under § 330(a)(2) of the Bankruptcy Code inasmuch as they all involve use of new technology which arguably is faster and more efficient than the older traditional technologies available in the operation of a professional firm. For example, in computer-accessed legal research, it will often be the case that use of such service, albeit at a cost of the estate if compensable as an *expense*, will be more cost effective because the professional hourly *fee* compensation involved will be cut down from that which would be compensable if the professional went to the books instead.

The problem is that the foregoing is not always true and use of such computer research services may simply serve the convenience and comfort of the professional

---

**8.** With regard to computer accessed legal research ("CALR") the access cost for the particular legal research does not present this problem, since it is specifically billed to the firm for that service, but the monthly or periodic "subscription" or similar charges do present a problem. Some of the applicants presently before this Court have excluded the periodic charge but others have included an approximation or pro ration of the periodic charge as part of their claims. CALR claims do separately present the "necessary" factor which will be dealt with below.

involved due to his or her professional training and experience. Moreover, this Court has seen a proliferation of "golden spike" memorandums which include more than sufficient legal citations to make the various points necessary in the memorandum—due to the facility with which the computer research method can produce extensive and redundant citations.[9] Legal memorandums to a court need to be persuasive on the points raised but do not need to be "gold plated" just because it is possible. Arguably, if the professional involved knows that the firm will have to absorb the charge within their hourly rates a lot of the gold plating involved will tend to disappear.

The "necessary" factor in terms of comparing options available to produce the result desired pervades all of these new types of expense reimbursements. It may well be true that telecopying a particular document to other parties is necessary and it may even be more cost effective in particular circumstances.[10] Whether use of new and more efficient technologies permitting document production and word processing is more "efficient" does not answer the question of whether it should be reimbursable. It may be that use of the older technologies available would be less efficient but would still produce the result necessary for the bankruptcy matter involved. The rub of course would be that the firm could not claim reimbursement for the old technologies involved, i.e. typewriters, secretaries, etcetera, since they would clearly come within the traditional demarcation of nonreimbursable "overhead" expenses.

Again, if courts are seriously going to require specific documentation *and explanation by the professional involved* of the reasons why the use of the new technology devices was appropriate and necessary in the particular case, the expenditure of time by both the professionals involved and the Court in determining these matters clearly can become counterproductive to the essential need to administer the bankruptcy case in question on its merits. It is arguable that professionals engaged in bankruptcy cases would do better to attend to the dying patient in the reorganization effort as opposed to attending to detailed documentation as to why the patient should currently cover as much of their own operating table expenses as possible.[11]

## THE EMPIRICAL PROBLEM

As noted above § 330(a)(2) of the Code does not include "costs of comparable services" as a factor to be considered in determining the appropriateness of reimbursing a particular expense as a cost to the estate. Moreover, even if that factor is to be considered relevant indirectly the courts generally do not treat the practices in nonbankruptcy areas as *determinative* of appropriate allowances under § 330(a), in view of the fact that that statutory provision retains the additional customary factors as to "the nature, the extent and the value of such services [and] the time spent on such services." See *ABI Report,* § 9.3.1, p. 155, and case decisions cited therein.

It is arguable that the "cost of comparable service" factor is necessarily implicated in compensation applications in bankruptcy cases as to *both* as to fees and expenses "since the reasonableness of the fee depends in part on which overhead items have been factored into the hourly rate" *ABI Report,* § 11.2.1, p. 224. This assertion may be disputed in that the statute does not prescribe a "reasonable" standard for expense reimbursements, as contrasted with fee awards, and it may well be that the peculiar requirements of documenting, establishing, and proving the actual costs and necessity of expenses in bankruptcy

---

**9.** When you complete laying a railroad an ordinary iron spike is sufficient to nail down the last rail but for various reasons a golden spike is traditional for that purpose.

**10.** To determine the latter point it is of course necessary to consider the *equation* involved, i.e., not only the comparison with costs of postage

and mailing (reimbursable) but also the savings to the firm with regard to secretarial and clerical time in accomplishing the mailing (nonreimbursable).

**11.** Is "Scalpel Nurse!" destined to become "Scalpel *and bill* Nurse!"?

cases justifies a departure from what may be customary practices in other areas of law practice. Indeed, it could be that it was this very consideration that lead to the particular and distinctive change in language between §§ 330(a)(1) and 330(a)(2) of the Code although no legislative history reference to that effect has been provided.

However, notwithstanding the foregoing considerations, this Court believes that some reference to existing customs and practices outside the bankruptcy court arena is relevant, at least in a sense of assuring that bankruptcy court compensation allowances are not "so far off base" as to seriously discourage qualified professionals from entering that arena.

The problem is the lack of reliable empirical data as to what is actually going on in that outside world. While the pleadings before me indicate that professionals "regularly" charge these new types of expenses to their clients my experience in practice with several law firms is that "it depends." While most law firms and other professional firms normally have "regular" billing practices I believe in practice that the rates and charges normally billed are just a "lodestar of sorts" from which the firm may go up or down depending on the particular client, its importance to the firm, the extent of its business presently engaged and contemplated for the future, and many other factors particular to various clients and the firm's current activity. It would be useful to have an empirical study as to how non-bankruptcy firms—or bankruptcy firms dealing with private clients— bill entities similar to a chapter 11 debtors in reorganization such as the present debtors who clearly have sufficient funds to pay fees and expenses regularly requested in comparable magnitudes.

There simply are no empirical studies establishing from a neutral standpoint

what is actually going on in the non-bankruptcy professional world in comparable cases. It may be that my own experience is not representative and that flexible billing and expense reimbursement practices do not generally occur. However, I do not know that to be true and I have no independent basis to ascertain what the current practices are. Bankruptcy courts simply do not have the time and resources to undertake such an empirical inquiry as to current billing practices in the relevant market area. As I indicated above the Office of the United States Trustee could undertake that task but funding for the same may be problematical.[12]

The questioning and desire for empirical data voiced above is not unique to this Court or to the bankruptcy world. The Court can take judicial notice of recent press reports indicating that both law firms and large corporate clients are questioning the escalation in hourly rates and the additional aggravation stemming from charges from "profit centers" in the law firm's expense reimbursement billings. The *Wall Street Journal* for May 26, 1992, p. B10, reported that a large Chicago law firm in "a sign of the tough times facing the legal profession" had sent a letter to its clients advising that they were cutting hourly rates and reducing other expenses routinely charged to clients. The article notes: "The letter makes a blatant pitch to clients who have seen their lawyers turn fax machines and telephones into sources of extra revenue. 'We have rejected the concept of law firm profit centers based on ancillary clerical and support services sold to clients,' it decrees. By marking down such traditionally lucrative services as duplicating (reduced to 10 cents a page from 20 cents a page) and filing court papers (reduced to $15 from $20), Kirkland is certain

---

**12.** It would be interesting to have an empirical study prepared by neutral parties having nothing to gain from bankruptcy practice answering a number of obvious questions: (1) Do firms tend to bill different clients differently depending on the various factors mentioned above; (2) Do firms really insist upon billing these new type of expense charges to large "cash cow" clients that they are already billing at their

highest hourly rate; (3) Is there any documented instance of any attorney charging less per hour then his peers (in terms of education and experience) just because his firm bills these new type of expenses to their clients whereas the other firms do not; and (4) Is there any historical evidence that hourly rates went down (adjusted for inflation) after firms switched to billing these new types of expenses to their clients?

to forfeit several million dollars from its bottom line, law firm management experts said."

Other recent press reports have indicated that General Motors Corporation and Walt Disney Corporation have sua sponte advised their outside attorneys that they will not pay for mark-ups or surcharges added to various expense reimbursement items, and will not pay at all for other new types of reimbursements claimed for things such as word processing, telecopy communications, etcetera. A copy of the letter and forms used by General Motors Corporation for this purpose is attached as an Annex to this Opinion. These recent developments "in the outside world" reinforce the qualms this Court has in taking at face value assertions that all of these new expense reimbursement billing practices are regular and universal in that world.

The lack of empirical data in this regard is frustrating for other reasons as well. In allowing reasonable *fee* compensation, for example, it is essential for the Court to have some readily available comparison between law firms' hourly rates in order to ascertain the reasonableness of the fee applications. That process use to be quite simple inasmuch as the nominal hourly rates were set forth in the applications and that was the end of that particular inquiry. However, at present, and if these new types of expenses are allowed reimbursement, any valid comparison of hourly rates for fee purposes is difficult to obtain, and more time-consuming in any event, because some hourly rates may include overhead expenses while other hourly rates arguably have been reduced due to alternative recovery of certain expenses.

Considering all of the foregoing this Court at this present time is simply in no position to give any substantial weight ei-

ther pro or con with regard to the claimed expense reimbursements under the "cost of comparable services" factor even if that factor is deemed to be legally pertinent.[13]

## CURRENT CASELAW/CONFLICT

The reported decisions on these new types of expense reimbursement requests provide decisions both for and against allowance from which any court can select decisions in support of its own conclusion. The decisions unfortunately often employ the "overhead" dichotomy which we have seen really does not provide a principled rationale for decisions applicable to current conditions. A sampling of the reported decisions illustrates the conflict and conclusions stemming from the lack of any agreement on the pertinent realistic underlying rationale.

### (a) *Telecopy ("Fax") Charges*

Telecopiers, otherwise known as facsimile machines and commonly referred to as "fax" machines, allow persons to transmit correspondence and other documents through the telephone lines.

Some courts have allowed reimbursement of charges for out-going facsimile transmission. *See e.g. In re Gillett Holdings, Inc.,* 137 B.R. 462 (Bankr.D.Col.1992) (although charges allowed as reimbursable expense, court cautioned future applicants that use of fax machine not an acceptable substitute for first-class mail); *In re Bank of New England Corp.,* 134 B.R. 450 (Bankr.E.D.Mass.1991) (reimbursable if reasonable and only at actual cost; outgoing telecopies should be charged at cost of long distance telephone rates, incoming telecopies should be charged at actual costs of paper, toner, ink, etc.); *In re Drexel Burnham Lambert Group, Inc.,* 133 B.R. 13, 33 (Bankr.S.D.N.Y.1991) (reimbursable

---

13. The *ABI Report* while informative and useful for many purposes does not provide the requisite empirical study and data to support a reliable view of the current billing practices by professionals in the non-bankruptcy world. The study was funded largely by bankruptcy professionals and directs itself to data accumulated by survey questions to bankruptcy professionals and bankruptcy judges. It also has extensive citations to current bankruptcy case de-

cisions on fees and expenses. It does not address the data questions summarized in footnote 10 above. Accordingly, it does not itself provide a basis for concluding that the items being claimed and allowed in the reported decisions do or do not track current practices in non-bankruptcy matters. Only a full-fledged empirical study addressed to that question could provide a basis for such conclusions.

at the lower of the toll charges or, if such is not readily determinable, $1.25 per page for domestic transmissions; charges for incoming faxes not reimbursable); *In re CF & I Fabricators of Utah, Inc.*, 131 B.R. 474, 493–494 (Bankr.D.Utah 1991) (only actual cost of telecopier will be reimbursed; charges necessary if incurred because service reasonably needed to achieve proper representation of client, but not where attorneys because of unwise planning used faxes instead of regular mail); *In re Riker Industries, Inc.*, 122 B.R. 964, 972 (Bankr. N.D.Ohio 1990); *In re Ginji Corp.*, 117 B.R. 983, 995 (Bankr.D.Nev.1990) (facsimile charges allowed, but only to extent of cost to law firm of facsimile transmissions); *Matter of Rauch*, 110 B.R. 467, 477 (Bankr. E.D.Cal.1990); *In re LBH Associates Limited Partnership*, 109 B.R. 157, 166 (Bankr.D.Md.1989); and *In re Churchfield Management & Insurance Corp.*, 98 B.R. 838, 878 (Bankr.N.D.Ill.1989) (all telecopy expenses allowed because shown to be reasonable and necessary).

Other courts have disallowed telecopy charges, although occasionally with a caveat that under certain conditions such charges may be deemed reimbursable. *See e.g. In re Garrison Liquors, Inc.*, 108 B.R. 561, 565 (Bankr.D.Md.1989) ("In order for such expenses to be compensable, they would have to be extraordinary and represent some vital necessity to the estate. In any event, *expenses must be disclosed in the application.*"); *In re St. Clair Supply Company, Inc.*, 1990 WL 43896 (Bankr. W.D.Pa.1990) (expense disallowed where no explanation why regular mail insufficient); and *In re Tom Carter Enterprises, Inc.*, 55 B.R. 548, 552 (Bankr.C.D.Cal.1985) (Telecopy charges "disallowed as not being substantiated as to cost or necessity, without prejudice to being clarified on next fee application").[14]

**14.** The *ABI Report,* § 11.2.3.(d), p. 232, indicates that of the bankruptcy judges surveyed 16 percent indicated they generally treated FAX charges as non-compensable.

**15.** The U.S. Trustee in the present case has suggested certain flat rates for outgoing and incoming fax transmission charges but these flat rates

While the great majority of bankruptcy court decisions to date have allowed telecopying charges subject to a showing of actual costs and necessity as indicated, the "expandability" danger mentioned above in connection with CALR usage obtains with regard to telecopying as well. It is very easy for all concerned when the professional simply says "fax it" but that can become a habit rather than a cost conscious choice. New technologies are emerging which will likely provide even more options—at a cost—for communications which will no doubt further suit the convenience and work habits of professionals in the future.[15]

Telecopying therefore should in my judgment be subject to the same analysis—as to whether it is reimbursable or nonreimbursable as an expense—as the other items pending before this Court notwithstanding the clear majority rule favoring reimbursement of telecopying costs. Those decisions essentially rely on the rationale of "overhead" as being the demarcation line which, as I have indicated above, essentially begs the question and provides no meaningful guidance for decision in my judgment.

### (b) *"Word Processing" Charges*

Word processing is a computerized form of typewriting. It is defined as "a computerized system programmed for rapid, efficient production and editing of letters, reports, business records, etc., usually including a keyboard, a video display, memory storage on tapes or disks, and a high-speed printer." *The Random House College Dictionary,* p. 1516 (1st ed. 1980). Word processing "has now replaced typing in most offices, and it is often (though not always) performed by an attorney's regular secretary since the ordinary typewriter is now as rare as the dodo bird in most law offices. ..." *In re Churchfield Management & In. Corp.*, 98 B.R. 838, 864 (Bankr. D.Ill.1989).

have not been shown to be based upon any actual cost analysis but are simply estimates or guess work similar to that employed by the professionals in their applications. It was clear during the hearings that none of the professionals really knew the actual costs of telecopy transmission and receipt of communications.

Word processing is generally considered an overhead expense that is not separately recompensable. *See e.g. In re Gillett Holdings, Inc.*, 137 B.R. 462, 474–475 (Bankr.D.Col.1992); *In re Bank of New England Corp.*, 134 B.R. 450 (Bankr. D.Mass.1991) ("Expenses for word processing will not be allowed absent the most compelling and well-documented circumstances."); *In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13, 33 (Bankr. S.D.N.Y.1991) ("Daytime, ordinary business hour charges for ... word processing ... are not reimbursable unless such charges are not included in the firm's overhead for the purpose of setting billing rates, in which case the application shall so state."); *In re Bicoastal Corp.*, 121 B.R. 653, 656 (Bankr.M.D.Fla.1990) (Word processing expense is "a cost of doing business which is built into [the] billing rate and should not be borne by the Debtors' estates."); *In re Washington Manufacturing Co.*, 101 B.R. 944, 960 (Bankr. M.D.Tenn.1989); *In re Churchfield Management & In. Corp.*, 98 B.R. 838, 864 (Bankr.N.D.Ill.1989); *Matter of D'Lites of America, Inc.*, 92 B.R. 554, 555 (Bankr. N.D.Ga.1988); *In re Motor Freight Express*, 80 B.R. 44, 47 (Bankr.E.D.Pa.1987); *In re First Software Corp.*, 79 B.R. 108, 124 (Bankr.D.Mass.1987); *In re S.T.N. Enterprises, Inc.*, 70 B.R. 823, 838 (Bankr. D.Vt.1987) (word processing characterized as nonreimbursable administrative activity); *In re Wabash Valley Power Association, Inc.*, 69 B.R. 471, 479 (Bankr.S.D.Ind. 1987); *In re Seneca Oil Co.*, 65 B.R. 902, 913 (Bankr.W.D.Okla.1986); *In re R & B Institutional Sales, Inc.*, 65 B.R. 876, 882 (Bankr.W.D.Pa.1986) (word processing costs are "overhead, pure and simple, attributable to the cost of doing business, and will not be compensated."); *In re Mandalay Shores*, 62 B.R. 758, 762 (Bankr. M.D.Fla.1986); *In re Pacific Express, Inc.*, 56 B.R. 859, 866 (Bankr.E.D.Cal.1985) (word processing should be factored into the hourly fee structure and is not separately compensable); *In re Cumberland Bolt & Screw, Inc.*, 44 B.R. 915, 917 (Bankr.M.D.Tenn.1984) (accountants' billing entry for word processing held indistin-guishable from any other overhead item); *In re Four Star Terminals, Inc.*, 42 B.R. 419, 427 n. 1 (Bankr.D.Alaska 1984) (court put applicants on notice that word processing charges are nonreimbursable, although such expenses were not requested in that case); *In re Sapolin Paints, Inc.*, 38 B.R. 807, 816 (Bankr.E.D.N.Y.1984) (word processing expense incurred by creditor's attorney held to constitute normal overhead; "In the view of the Court, word-processing is an alternative to secretarial services which constitute part of the normal overhead of a law office and is compensated for by the hourly rate charged."); and *In re Coconut Grove Bayshore, Inc.*, 33 B.R. 194, 196 (Bankr.S.D.Fla.1983) (Bankruptcy Act case: word processing held to be overhead).

Other courts have allowed word processing to be a reimbursable expense, in some instances mandating certain prerequisites for such reimbursability. *See e.g. In re UNR Industries, Inc.*, 72 B.R. 796, 801 (Bankr.N.D.Ill.1987); *In re Thacker*, 48 B.R. 161, 164 (Bankr.N.D.Ill.1985) (court requested that counsel supplement an application to ensure that an entry for word processing was not ordinary secretarial costs); and *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 585 (Bankr.D.Utah 1985).

The rationale for disallowing word processing charges was explained by the bankruptcy court for the Eastern District of Pennsylvania:

In particular, we find disturbing the charge for "document production", which is asserted to be a customary practice of billing clients on a per page basis for documents produced through the Applicant's word processing system. This practice epitomizes the unacceptable efforts by law offices to transform traditional overhead expenses, e.g. secretarial time to produce any given document, into a reimbursable expense payable by the estate. The Applicant asserts that the use of word processing is an efficient labor saving device and is a savings to the estate. We would agree with such an assertion as long as it is not passed on as an additional expense to the estate.

However, we would characterize the availability of such modern time savings devices such as word processing capabilities as providing a substantial savings *to the law office,* obviously resulting in a higher net profit, rather than as providing a savings to the estate.

*In re Motor Freight Express,* 80 B.R. 44, 47 (Bankr.E.D.Pa.1987) (emphasis in original).

The applicants herein have provided no convincing contrary rationale or policy regarding word processing charges, including so-called "extraordinary" word processing charges.

### (c) *Document Production*

"Document production" is listed as an expense item on some of the applications, separate from word processing and photocopying. I assume it involves tasks such as compiling, collating, and binding multiple documents, although the parameters of this chore are not clear from the applications. Apparently, I am not the first bankruptcy judge to be puzzled by this expense request: the bankruptcy court for the central district of california stated, "Until an explanation of what is entailed under 'document production' is made, (Is it the same as photocopying?) this will be disallowed." *In re Tom ·Carter Enterprises, Inc.,* 55 B.R. 548, 552 (Bankr.C.D.Cal.1985). *See also In re Motor Freight Express,* 80 B.R. 44, 47 (Bankr.E.D.Pa.1987) (document production part of law office's overhead).

### (d) *Secretarial Overtime*

Some applicants for expense reimbursement seek allowance of the cost of secretarial overtime. They contend that, "[L]aw firms customarily charge the cost of secretarial overtime to the client for whom the overtime work is required and performed, both in bankruptcy and nonbankruptcy matters. Separate billing of the cost of overtime is appropriate in light of the fact that professional hourly rates are not based upon extraordinary added costs such as secretarial overtime." Hale & Dorr Application for Reimbursement of Expenses, NHEC, (Court Document No. 404).

Charges for secretarial overtime have previously been considered and disallowed by bankruptcy courts. *See e.g. In re Drexel Burnham Lambert Group, Inc.,* 133 B.R. 13, 33 (Bankr.S.D.N.Y.1991); *In re Rauch,* 110 B.R. 467 (Bankr.E.D.Cal.1990) (Expenses relating to clerical services are nonreimbursable overhead.); *In re St. Clair Supply Company, Inc.,* 1990 WL 43896 (Bankr.W.D.Pa.1990); *In re Belknap, Inc.,* 103 B.R. 842 (Bankr.W.D.Ky. 1989) (Clerical pay disallowed as overhead.); *In re Washington Manufacturing Co.,* 101 B.R. 944, 960 (Bankr.M.D.Tenn. 1989); *In re Orthopaedic Technology,* 97 B.R. 596 (Bankr.D.Col.1989); *In re Command Services Corp.,* 85 B.R. 230, 233 (Bankr.N.D.N.Y.1988) ("Secretarial time has been generally considered to be an item of overhead factored into an attorney's rate per hour, and not separately compensable."); *In re Bonds Lucky Foods, Inc., No. 1,* 76 B.R. 664, 668 (Bankr.E.D.Ark.1986); *In re S.T.N. Enterprises, Inc.,* 70 B.R. 823 (Bankr.D.Vt.1987); *In re Wabash Valley Power Ass'n., Inc.,* 69 B.R. 471 (Bankr. S.D.Ind.1987); *In re Pacific Express, Inc.,* 56 B.R. 859 (Bankr.E.D.Cal.1985) (Secretarial overtime should be factored into the hourly fee structure and is not separately compensable.); *In re Tom Carter Enterprises, Inc.,* 55 B.R. 548, 552 (Bankr. C.D.Cal.1985); *In re Jensen,* 47 B.R. 557, 584 (Bankr.D.Utah 1985) (court provided examples of overhead, including secretarial services); *In re Westwood Asphalt Paving, Inc.,* 45 B.R. 111 (Bankr.E.D.Mich. 1984); *In re Global Intern. Airways Corp.,* 38 B.R. 440 (Bankr.W.D.Mo.1984); *In re City Planners & Developers, Inc.,* 5 B.R. 217, 219 (Bankr.D.Puerto Rico 1980) ("[W]e agree with the debtor that charges for secretarial overtime ... are not proper charges and we disallow them...."); and *In re Arlan's Department Stores, Inc.,* 462 F.Supp. 1255 (S.D.N.Y.1978).

Other courts have indicated that secretarial services may be reimbursable if certain criteria were met. *See e.g. Boston & Maine Corp. v. Moore,* 776 F.2d 2, 11 (1st Cir.1985); (general practice in relevant market area to secretarial overtime); *In re Drexel Burnham Lambert Group, Inc.,* 133 B.R. 13, 33 (Bankr.S.D.N.Y.1991)

("Daytime, ordinary business hour charges for secretarial ... and other staff services (exclusive of paraprofessional services) are not reimbursable unless such charges are not included in the firm's overhead for the purpose of setting billing rates, in which case the application shall so state."); *In re Rusty Jones*, 134 B.R. 321 (Bankr.N.D.Ill. 1991) (secretarial overtime charges not allowed because "[t]he reasonable need and usefulness to the estate ... was not demonstrated"); *In re Waldoff's*, 132 B.R. 329 (Bankr.S.D.Miss.1991) (overtime reimbursement not granted because fee petition did not contain sufficient details to show reasonableness or necessity of overtime expenses); *In re Murray*, 132 B.R. 329 (Bankr.D.Mass.1991) (overtime expenses reimbursable if there were a "compelling reason for such charges"); *In re Ginji Corp.*, 117 B.R. 983, 995 (Bankr.D.Nev. 1990) (secretarial overtime allowed, but only to extent of cost to the firm); *In re Stoecker*, 114 B.R. 965, 979 (Bankr.N.D.Ill. 1990) ("Absent extraordinary circumstances, which have not been shown here, the Court views secretarial overtime as an overhead expense and thus non-compensable."); *In re Leonard Jed Co.*, 103 B.R. 706, 711–712 (Bankr.D.Md.1989) ("Reimbursement for ... secretarial overtime will be disallowed where the applicant has shown no compelling need to provide [it] in the first place."); *In re Convent Guardian Corp.*, 103 B.R. 937 (Bankr.N.D.Ill.1989) (Items such as secretary costs denied absent "extraordinary circumstances".); *In re WHET, Inc.*, 62 B.R. 770 (Bankr.Mass. 1986) (unjustified secretarial overtime expense will be disallowed); *In re Island Helicopter Corp.*, 53 B.R. 71 (Bankr. E.D.N.Y.1985) (cost of secretarial overtime not reimbursable to creditors' committee counsel where necessity for it was not established); and *In re Thacker*, 48 B.R. 161 (Bankr.N.D.Ill.1985).

### (e) *Computer–Accessed Legal Research (CALR)*

Computer-accessed legal research (CALR) such as WESTLAW or LEXIS has two distinct expense components. CALR has a fixed cost subscriber fee, similar to the cost of subscribing to legal digests and reporters, which is and should be properly included as an overhead expense. CALR also has a time charge for accessing its databases to do legal research, similar to the time charges of an attorney doing research in texts. (One applicant states that WESTLAW bills for its usage in the $200/ hour range.)

Courts are divided as to whether CALR should be a reimbursable expense. Many courts have disallowed CALR as a reimbursable expense. *See e.g. In re Belknap, Inc.*, 103 B.R. 842 (Bankr.W.D.Ky.1989) (computer research charges disallowed as overhead); *In re Command Services Corp.*, 85 B.R. 230, 234–235 (Bankr. N.D.N.Y.1988) ("This Court has consistently held that [CALR] expenses are not reimbursable from the Debtor's estate."); *In re First Software Corp.*, 79 B.R. 108, 120 (Bankr.D.Mass.1987); *In re Cuisine Magazine, Inc.*, 61 B.R. 210 (Bankr.S.D.N.Y. 1986); and *In re Sapolin Paints, Inc.*, 38 B.R. 807, 816 (Bankr.E.D.N.Y.1984) ("... Lexis research is simply another method for performing research which also constitutes part of the services which are included in the hourly rate.")

Other courts have allowed CALR charges to be reimbursed. *See e.g. In re Wizard Enterprises, Inc.*, 109 B.R. 708 (Bankr.W.D.La.1990) (CALR reimbursable); *In re Leonard Jed Co.*, 103 B.R. 706, 712 (Bankr.D.Md.1989) (reimbursement for "computer research attributable to work done for this particular client" allowed.); *In re UNR Industries, Inc.*, 72 B.R. 796, 802 (Bankr.N.D.Ill.1987) (lexis research reimbursed); *In re Paolino*, 71 B.R. 576 (Bankr.E.D.Pa.1987) (cost incurred for lexis research, if properly documented, will be allowed as reimbursable expense); *In re Seneca Oil Co.*, 65 B.R. 902, 913 (Bankr. W.D.Okla.1986) (Disallowance of charges for computerized legal research and other non-overhead expenses "could result in an increase in hourly rates, discourage the use of helpful research tools, or reduce incentives for professionals to practice before bankruptcy courts."); *In re Tom Carter Enterprises, Inc.*, 55 B.R. 548, 552 (Bankr. C.D.Cal.1985) (computer research expense

approved); and *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 585 (Bankr.D.Utah 1985) (Court stated that, although some courts disallowed reimbursement for various expenses, including legal computer costs, it was going to allow those costs to be reimbursable due to "the practice within the profession of billing them to regular clients.")

Of course, even those courts that have allowed CALR to be a reimbursable expense have only allowed reimbursement of reasonable and necessary CALR costs, pursuant to the standards set forth in section 330(a)(2) of the Bankruptcy Code. Under this standard, applicants would have to show that computerized research actually reduced the amount of time attorneys spent to research complex legal issues. In *In re Wittman Eng'g & Mfg. Co., Inc.*, 66 B.R. 488, 15 BCD 59 (Bankr.N.D.Ill.1986), the court held that fees cannot be allowed for general research of law which is well known to practitioners in the area of law involved. Similarly, expense reimbursement should not be allowed for computerized legal research of a general nature, or for such research when it is unnecessary in that the same law is available in conventional textbooks.

## CONCLUSION

■ After considering all of the foregoing this Court concludes that telecopying, word processing, document production, and computer-accessed legal research expense reimbursement claims should not be allowed at the interim compensation stage of a bankruptcy reorganization proceeding, and should not be allowed at all in most cases unless at the conclusion, when final fee awards are made, the applicant *at its own expense nonreimbursable from the estate* prepares and submits specific evidence establishing the actual cost involved, the necessary nature of the expenditures involved, and a showing that due to the magnitude of the expenses involved it would be unfair in the particular case to consider these items as part of the overhead of the firm more properly factored into their hourly fee rates.[16]

I reach this conclusion because in the absence of any contrary direction or explicit guidance from Congress, or an empirical study on the interrelationships between hourly rates and expense billing practices that would support a different conclusion, I believe the path of wisdom is to disallow expense reimbursements that were considered "traditional overhead" at the time Congress enacted the 1978 Bankruptcy Code. Expense items "traditionally" allowed reimbursement include such things as photocopying, postage and travel because they are clearly incurred on behalf of a particular client. *In re National Paragon Corp.* 76 B.R. 73, 74 (Bankr.E.D.Pa. 1987). It is clear that the items here in question were not customarily billed to either private clients or bankruptcy estates. It is of course true that all traditions have to begin somewhere but again the "birth" of a new tradition requires specific proof and not mere conjecture or anecdotal evidence. See *In re Washington Manufacturing Company*, 101 B.R. 944, 961 (Bankr.M.D.Tenn.1989). *Cf. also In re Wolverine Knitting Mills, Inc.*, 107 B.R. 546, 547 (Bankr.E.D.Mich.1989).

■ Alternatively, and in the absence of any meaningful guidance from the "overhead" principle, this Court finds as a general principle that the following standards should be employed for determination of allowance or disallowance of expense reimbursements under § 330(a)(2) of the Bankruptcy Code:

(1) Expenses are not reimbursable unless their "actual cost" is demonstrated by either a discrete third party transaction, attributable to the bankruptcy client on its face, or a detailed actual cost documentation prepared by the professional involved at no charge to the bankruptcy estate.[17]

---

**16.** The question of secretarial overtime stands on a different footing and will be considered below.

**17.** While I have consistently followed those decisions that hold that professionals in bankruptcy cases are entitled to include in their fee applications the time required to prepare those

(2) Even if the expense meets the foregoing actual cost requirement it still may not be reimbursable if the item in question raises substantial "necessary" questions in terms of a detailed cost-benefit analysis particular to the item and the case which would require considering all pertinent available alternatives.

(3) Expense items that do not meet the foregoing requirements are better left to self-policing by the professionals involved spurred by a motivation to keep their usage to an absolute minimum as may be necessary to perform their services since they will have to be absorbed into their hourly fee requests and will not in effect be "passed through" to a client.[18]

(4) To be fair a "safety valve" opportunity should be provided to professionals involved in any truly exceptional case to demonstrate at the conclusion of the case that, notwithstanding their fee allowances, it would be inequitable to require them to absorb a substantial magnitude of operating expenses into their hourly rates, but again provided that the time and effort necessary to demonstrate the foregoing is not itself to be claimed as reimbursable from the estate.

■ Applying these standards to the pending request for reimbursement of tele-copying, word processing, document production, and computer-accessed legal research charges it is apparent even apart from the reference as to what was "traditional" at the time of the enactment of the 1978 Bankruptcy Code that they should be denied compensation.

■ Turning to the remaining question, relating to secretarial overtime, I believe that that item stands on a different footing and can and should be allowed under the

pending claims. Such charges present no problems with regard to the actual cost involved The "necessary" factor can safely be left to the judgment of the professional involved inasmuch as the court can take judicial notice that bankruptcy cases by their nature often require quick action on much shorter deadlines than in normal litigation. Moreover, as was indicated above, the appropriateness for reimbursement for this type of expense in bankruptcy cases has been explicitly recognized by the Court of Appeals for this Circuit. *See In re Boston & Maine Corp. v. Moore,* 776 F.2d 2 (1st Cir.1985).

It may seem inconsistent to rely upon the "bald assertion" by the professional involved, with regard to the necessary nature of secretarial overtime, whereas the Court will not accept simple conclusory assertions in that regard with regard to the other expense items discussed above. The difference however is that I have no reason to second-guess a professional as to a personal direction to his or her own secretary to work overtime to accomplish a specific result—knowing as I do the time urgencies of bankruptcy practice—but I do have reason to doubt conclusory assertions with regard to the other items. The reason for my doubt with regard to the other items is not attributable to any belief that professionals involved are not being truthful or otherwise acting improperly but simply from my conviction that professionals engaged in this type of practice do not really have the time or the data available to constantly be making the requisite analysis as to the cost effectiveness and other choices relating to the items in question. Far better to leave such items to the self-policing effect of absorbing their costs into the hourly fee rates absent a truly extraordi-

---

applications, in view of the peculiar requirements of the bankruptcy fee allowance practice, those decisions do not address the unique problem presented when professionals request reimbursement for *expenses* in which the actual cost is not apparent on its face from a third party transaction. If professionals are to seek compensation for such expenses to satisfy the "actual cost" requirement of § 330(a)(2) it would be inappropriate in my judgment to require the

bankruptcy estate to pay for their time and efforts in ascertaining those actual costs.

18. Professionals not recovering such expenses directly from clients of course could raise their hourly rates to cover that absorption but such increases would be restrained by market conditions, i.e., if other firms not billing such charges nevertheless have lower hourly rates clients would tend to gravitate toward the latter.

nary final case result in which complete denial would be demonstrably inequitable.[19]

Separate orders granting and denying the claimed expenses in accordance with this Opinion shall be entered in the respective cases.

The ruling embodied in this opinion will be applied to the pending expense reimbursement requests in the present cases and will be applied in the future to such requests in these and other cases in this Court. This ruling will not be applied retroactively to expense reimbursements already authorized prior to the date of this opinion whether in interim or final fee award orders.

**19.** There are some recent indications that efforts are being made to promulgate "guidelines" or other legislative-type solutions to the problems presented by the new types of expense reimbursements dealt with in this opinion. The U.S. Trustee for the Central District of California has circulated a draft "Professional Fee Billing Guidelines" to the bankruptcy bar and bankruptcy judges for comment. See *Draft of Proposed U.S. Trustee Professional Fee Billing Guidelines for the Central District of California,* ("U.S. Trustee Guidelines"), Bankruptcy Court Decisions, News & Comment Index, pp. A5–A–6 (February 27, 1992). The bankruptcy judges for the Southern District of New York (a district that includes the "Manhattan" once ruled by Peter Stuyvesant as Royal Dutch Governor) have promulgated detailed "Guidelines For Fees And Disbursements For Professionals" in that district, as reflected in an appendix to the opinion in *In re Drexel Burnham Lambert Group, Inc.,* 133 B.R. 13, 29–33 (Bankr.S.D.N.Y.1991). However, in reading these guidelines this Court wonders whether these "proclamations" by the bankruptcy judges may not simply be met by a returning fusillade of "certifications" by the bankruptcy professionals, leaving the underlying actual cost and necessary data undisclosed on the record. Peter Stuyvesant himself was wont to fight his battles by "firing off a salvo of proclamations" as Washington Irving tells us but the result was not particularly successful. I myself find more comfort in the market and the self-policing motivations discussed above to assure that these highly expandable types of expenses are kept under control without undue involvement by the Court or the professionals in extensive paper work and documentation. However, if Congress should direct otherwise by an explicit listing of reimbursable and non-reimbursable expenses, this Court of course would comply notwithstanding its qualms about the ever-increasing amounts of these new types of expense reimbursement claims.