**In re MARUKO INC.; Maruko Guam Inc.; and Maruko New York Inc., Debtors. (Two Cases)**

**Bankruptcy No. 91–12303–A11.**
**Adv. Nos. 91–12546, 91–13398.**

United States Bankruptcy Court, S.D. California.

Sept. 10, 1993.

---

636

Michael R. Brown, Cooper, Brown, Kardaras & Scharf, Pasadena, CA (Fee Examiner).

Mary Testerman, Office of the U.S. Trustee, San Diego, CA, for U.S. Trustee.

Richard L. Wynne, Bennett Spiegel, Levene & Eisenberg, Los Angeles, CA, for Official Creditors' Committee.

Arnold M. Quittner, Adrienne M. Coffin, Stroock & Stroock & Lavan, Los Angeles, CA, for debtors.

## MEMORANDUM DECISION

LOUISE DeCARL ADLER, Bankruptcy Judge.

The process of considering the first, second and third interim applications for attorneys' fees for debtor's counsel, Stroock & Stroock & Lavan ("Stroock") started on March 22, 1993, at the first hearing. By reason of objections by the United States Trustee and comments of Michael R. Brown, court-appointed fee examiner, this process was continued to permit the United States Trustee to file an amendment to its objection (which was done on March 24, 1993); to permit Stroock to file a supplement to its reply (which it did on April 30, 1993); to permit the United States Trustee to respond to the reply on May 7, 1993; to permit the Fee Examiner to comment on Stroock's supplement to the reply (on May 14, 1993); and, to permit Stroock once again to reply to the United States Trustee's response and the Fee Examiner's comments on May 26, 1993. A continued hearing was held on May 27, 1993, to further air the remaining criticisms and responses.

Although to my recollection I have never previously addressed by written opinion a request for interim attorneys' fees and costs, in this extraordinary case I depart from this practice. I do so for the purpose of giving debtor's counsel, the Fee Examiner and the United States Trustee some general guidelines for application in this case, not only to assist in review of debtor's counsel's fees, but also the review of other professionals. At issue is an original request by debtor's counsel of $1,533,787 in fees and $156,552.74 in costs for billing periods extending from October 30, 1991, to November 30, 1992.

As stated, this case is somewhat extraordinary for this Court. It is the first of the "mega-cases" which have been filed before me.[1] Debtor's counsel claims this is the first coordinated American and foreign bankruptcy ever filed. This Chapter 11 was filed as a vehicle to reorganize the non-Japanese assets of a Japanese-headquartered corporation which had previously filed for reorganization in Japan. As a non-ancillary, co-equal reorganization, it is probably unique. More than 7,000 creditors are affected by the American case alone; an estimated 30,000 creditors in Japan have, at the American debtors' request, been excluded from participation in this case and look to the Japanese case only.

The case is also unique as it is the first one in which the Court has employed the use of a fee examiner. Pursuant to Federal Rule of Evidence 706(a) and 11 U.S.C. § 105(a), this Court, after notice and hearing, *sua sponte*, appointed Mr. Michael Brown and Lauditors, Inc., as Fee Examiner, to assist the Court in carrying out her duties under 11 U.S.C. §§ 330 and 331. All professionals were directed to format their fee applications in accordance with United States Trustee Guidelines for the Central District of California and provide them to the Fee Examiner in advance of calendaring hearings on interim fee applications. Upon consultation with the Fee Examiner as to the length of time required for his review and written report, interim hearings were scheduled.

At the Court's direction, Mr. Brown and Lauditors, Inc., prepared a written analysis of each interim fee application submitted, which discussed hours billed, duplicate time entries, vague time entries, transient billers and expense requests. They also prepared special reports analyzing time entries spent on "analysis", "review", "inside conferences" and "research", to assist the Court in determining the reasonableness of fees requested. Additionally, they highlighted certain entries by attorneys and para-professionals which could arguably be considered "administrative tasks", clerical in nature and, therefore, noncompensable. The Fee Examiner's assistance has been invaluable to the Court in addressing the logistical burdens and difficulties of reviewing and reconciling multiple fee applications.

## FEE ALLOWANCES IN GENERAL

■ Under § 330, the Bankruptcy Court is charged with an independent judicial responsibility to review and evaluate professionals' fees. *In re Bank of New England*

---

1. The term "mega-case" has been defined as a bankruptcy involving a debtor with assets of at least $100 million. Gibson, *A Guide To The Judicial Management Of Mega–Cases* (1992).

*Corp.,* 134 B.R. 450, 453 (Bankr.E.D.Mass. 1991). It may do so with or without expert witnesses. *In re WHET, Inc.,* 61 B.R. 709, 713 (Bankr.D.Mass.1986). Some of my colleagues abhor this task:

> The review of professional fees by a Court . . . is distasteful to the Court and demeaning to the professional. Unfortunately, however, it is mandated by the Bankruptcy Code § 330.

*In re Drexel Burnham Lambert Group, Inc.,* 133 B.R. 13, 15 (Bankr.S.D.N.Y.1991). Others of my colleagues are more sanguine about it:

> "The bankruptcy judge can and must apply his [sic] own expertise *sua sponte,* if necessary, in order to be fair to both counsel and creditors because, in the final analysis, either excess generosity or extreme miserliness in allowing fees will reflect in the public perception of the system." *In re Pettibone Corp.,* 74 B.R. 293, 300 (Bankr. N.D.Ill.1987) (*quoting* Lavien, *Fees as Seen from the Bankruptcy Bench,* 89 Comm.L.J. 136, 138 (March 1984)).

Regardless of personal attitude, this Court agrees with Judge Volinn that "The fixing of attorneys fees [is] a most sensitive and difficult area of effort. . . ." *In re Powerine Oil Co.,* 71 B.R. 767, 768 (9th Cir. BAP 1986).

■ The Ninth Circuit standard for calculating a reasonable attorney's fee under § 330 is found in *In re Yermakov,* 718 F.2d 1465 (9th Cir.1983), which states:

> The primary method used to determine a reasonable attorney fee in a bankruptcy case is to multiply the number of hours expended by an hourly rate.

*Id.* at 1471.

This is referred to as the "lodestar" approach. While it is true that Congress' adoption of § 330 was intended to be a retreat from cases guided by notions of the economy of the estate in fixing fees of bankruptcy professionals, it cannot be assumed that Congress intended to pay those professionals a higher compensation than they would have received in the non-bankruptcy arena:

> However, we think that in enacting that section Congress did not intend to authorize higher compensation than attorneys would receive for comparable non-bankruptcy services.

*In re Manoa Finance Co., Inc.,* 853 F.2d 687, 690 (9th Cir.1988).

## EXPENSE ALLOWANCES IN GENERAL

Section 330(a)(2) of the Bankruptcy Code permits reimbursement for actual, necessary expenses. The Office of the United States Trustee in each region has adopted guidelines as to what expenses may be properly charged to a debtor's estate as a reimbursable cost. To simplify the report and examination of expense items, and because of the predominance of Los Angeles bankruptcy professionals in this case, this Court announced early in the case that the United States Trustee guidelines for the Central District of California (which does *not* include San Diego) would be applied to this case. Although the Central District guidelines do not diverge in spirit from the Southern District of California guidelines, they are somewhat more explicit and should have been more familiar to the majority of the professionals in this case.

In his thoughtful and exhaustive consideration of the question of expense reimbursement, Judge James E. Yacos considered the problem of the increasingly blurred line between what is customarily regarded as "overhead" and what is a recoverable client expense:

> "[M]erely because these practices are routine does not convert overhead expenses to out of pocket expenses. (citations omitted) The idea that bankruptcy courts should automatically allow reimbursement for expenses which might otherwise be considered overhead just because the profession as a whole succeeds with such creative billing practices is unacceptable to this Court. . . ." (citation omitted). *In re New Hampshire Electric Cooperative, Inc.,* 146 B.R. 890, 893–94 (Bankr.D.N.H.1992).

While it is clear that expenses recoverable under § 330(a)(2) cannot include profit or mark-up, *Id.* at 895, Judge Yacos seems correct in his observation that there is little guidance for the court as to whether such

expenses are regularly recovered from clients "in the outside world:"

> The problem is the lack of reliable empirical data as to what is actually going on in that outside world. While the pleadings before me indicate that professionals "regularly" charge these new types of expenses to their clients my experience in practice with several firms is that "it depends". While most law firms and other professional firms normally have "regular" billing practices I believe in practice that the rates and charges normally billed are just a "lodestar of sorts" from which the firm may go up or down depending on the particular client, its importance to the firm, the extent of its business presently engaged and contemplated for the future, and many other factors particular to various clients and the firm's current activity.

*Id.* at 897.

There is simply a dearth of neutral information on what law firms are recovering from clients in the non-bankruptcy arena in this competitive legal climate. It is with these observations that I turn to both the questions of fee and expense allowance.

## I. FIRST INTERIM APPLICATION
### A. FEE REQUEST

For the first interim period of October 30, 1991, to February 29, 1992, the Stroock firm initially requested fees of $485,990, and costs of $51,803.32.[2] In its March 17, 1993, Reply, the firm reduced the total fees for this period to $481,752, and costs to $47,262.74. In its April 30, 1993, Supplement to Reply to Objections of the United States Trustee, etc., the firm once again reduced fees, to $479,-962.50. Generally, the fee reductions were in response to objections and/or comments[3], questioning certain duplicate entries by a paralegal, and certain time entries which are properly categorized as "clerical" and therefore non-recoverable as attorneys' fees or para-professional fees. There were many other objections/comments for which adjust-

ment was not made by the firm, which the Court now addresses.

■■■ **1. High Hourly Rate:** When challenged on the observation that the hourly rates charged by Stroock were on the "high end", Stroock submitted its March 17, 1993, Reply containing the Declaration of Anne Carter, one of its paralegals, stating that she reviewed applications to employ counsel in six pending Central District (Los Angeles) bankruptcy cases and excerpted the relevant portions of each. Presumably, this exercise was done for the purpose of convincing the Court that, indeed, there are other firms in Los Angeles which charge the same high hourly rates. While that is no doubt true, as observed above, what is charged by other bankruptcy practitioners is *not* the standard to be applied to determine what is a reasonable hourly rate. In footnote 10 of his First Report, Mr. Brown volunteered to provide the Court with information regarding fees charged by bankruptcy and non-bankruptcy firms for attorneys at the identified levels. While the Court makes no adjustment of the firm's fees at this point, I am requesting that Mr. Brown provide this information in advance of the final fee hearing in this case.

**2. Transient Billers:** Mr. Brown alerted the Court to what appears to be the firm's practice of using individuals "... who appeared to visit the file on a limited basis." (First Report, p. 11) This was a recurring theme in his second and third report on Stroock's second and third interim fee applications. His observation and the Court's concern is one of incurring significant start-up or training time and of duplicative efforts by numerous billers.

■■■ **3. Billing Judgment:** Billing judgment is the adjustment or write-down of time by a law firm because of its own judgment that the time was either excessive, duplicative, unnecessary or part of start-up time or training time for a new lawyer or a lawyer new to the case. These adjustments usually are made by a senior attorney of the firm in

---

2. For purposes of all interim requests, the Court has not allocated the fees and costs request between Maruko, Inc., Maruko Guam, Inc., Maruko New York, Inc., and Maruko USA, Inc., administratively consolidated debtors.

3. The fee examiner's pleadings are entitled "Comments"; the United States Trustee's are entitled "Objections".

advance of sending a bill to a client. *In re Pettibone Corp.*, 74 B.R. 293, 303 (Bankr. N.D.Ill.1987). While Stroock made much of its exercise of "billing judgment"—claiming in the declaration signed under penalty of perjury by Michael Newton to have written down an aggregate of $227,206.92 in fees for the first three interim applications *before* filing the applications—by letter to the Court dated July 21, 1993, the firm now disavows that position, stating it cannot document that claim.

Accordingly, the Court is undertaking the tedious task of doing that which the firm should have done in advance of its submittal to the Court and reviewing the entries in light of these concerns:

■ **a. Attorney 1**[4]: Attorney 1 spent 14.9 hours, or $2,980 at her $200/hour billing rate in a task denominated "reviewing files". This was 13 percent of her time. In addition, she spent time performing arguably clerical tasks—for example, "11/15/91—.10 hours, send purchase agreement to Maruko." Further, she spent a significant amount of time in non-specific research—for example, "1/8/92, 11.5 hours, research re various issues concerning secured creditors' rights and related matters, etc."

Finally, Attorney 1 lists two days on which she claims to have billed 11.5 and 11.2 hours, respectively. In my letter of July 16, 1993, awarding fees and costs to Deloitte and Touche, accountants in this case, I observed:

> In other cases this Court has previously disallowed hours billed in excess of 9.0 hours in any one day. There are a variety of reasons for doing so, including the Court's perception that efficiency suffers greatly when parties are repeatedly billing in excess of nine hours per day. Additionally, having had private practice experience and fully understanding what it takes to bill an "honest hour", I question any bill where a party appears to be seeking to attribute every hour spent at work to a client. Accountants and attorneys are hu-

man beings, and not every moment of the working day is productive and billable. Finally, Deloitte's application in its response was silent as to any justification for the repeated "high billed" days. No emergency (other than self-created) was shown to exist which might justify the charges in some cases.

(Letter to Deloitte & Touche, July 16, 1993, p. 2).

Those principles discussed in the Deloitte letter are present here. An examination of the days in question shows no particular urgency to the tasks performed, and none has been suggested.

Based on the foregoing observations, the Court adjusts Attorney 1's fees by deducting $5,715, or 25 percent of the time billed.

■ **b. Attorney 2**: At $175/hour, Attorney 2, a four-year associate, spent most of his time in legal research. While some of the research was unique to issues in this case (e.g., equitable subordination), other research appears to have been in the nature of general education. Finally, having had the benefit of 13 months of billing periods before me, Attorney 2's involvement is truly "transient". While he billed in this period, there was no significant time spent in later periods on this case. The significance of this is apparent when one considers the Fee Examiner's question why one of the other lawyers already involved in this matter was not asked to conduct the research.

Based on the foregoing comments, the Court adjusts Attorney 2's fees by deducting $906.

■ **c. Attorney 3**: Attorney 3 was admitted to practice approximately one-half way through the first interim billing period. As observed by the Fee Examiner, his work was mostly in preparation of employment applications and research. It appears that Stroock exercised little billing judgment with respect to his time. Much of it was spent on matters of his general education, no doubt

---

4. It is not the desire or intent of the Court to damage reputations in reviewing the performance of the lawyers and para-professionals of the Stroock firm. Because of the critical nature of some of my comments and my hope that, in light of them, practices within the firm will change, I choose not to publish the names of the individuals reviewed. Instead, their identities will be disclosed only in an unpublished Appendix to this Memorandum Decision.

due to inexperience. For example, the 12/5/91 entry of 3.0 hours to prepare a motion to extend time to file schedules and points and authorities thereon should have been significantly less. This simply could not have been the first time Stroock needed to obtain an extension of time to file schedules, and "boiler plate" points and authorities no doubt were available. Similarly, significant amounts of time were spent on employment applications for counsel and accountants and on motions to extend time to assume or reject leases. Once again, both tasks should be relatively routine in a large insolvency firm such as Stroock.

Accordingly, the fees billed by Attorney 3 will be reduced by deducting $8,000.

**d. Attorney 4:** Once again, Stroock should have exercised billing judgment with respect to Attorney 4's time. After spending significant amounts of time on a noticed motion (only to have it rejected), she reviewed the Bankruptcy Local Rules for this district and thereafter followed the correct procedure—all at the expense of the client. She also spent significant amounts of time conferring with senior associates and partners, no doubt to seek direction because of her relative inexperience as a first-year associate.

Attorney 4's billed fees will be reduced by $2,500.

**e. Attorney 5:** The Court concurs with the Fee Examiner's observation that Attorney 5's entries are vague and ambiguous. It is counsel's duty to fully explain the nature of the services rendered, and she has not done so. The Court disallows $150.

**f. Attorney 6:** Attorney 6 is also a transient biller to this file. While he is a relatively experienced attorney, much of his time was spent in instructing junior associates. Although he was active in two "brainstorming" sessions with another associate, it is difficult to appreciate how his limited involvement (.3 hours; .1 hours) could have given him an appreciation sufficient to "develop strategy". The Court disallows $330 of his time billed to this case.

**g. Attorney 7:** Vague and ambiguous entries; Court disallows $105.

**h. Attorney 8:** Attorney 8 was admitted to practice one month after the commencement of this first interim period. Once again, some review of his work to excise charges reflecting his inexperience should have been performed. For example, he spent 5.3 hours at $135/hour on the most basic of bankruptcy principles—notice of the automatic stay (which generally is given by sending a form). While Attorney 8's declaration details the difficulty of obtaining a removal of a certain case, he still failed to adequately document all of his work—for example, "1/17/92, .5 hours, telephone conference with Ikeda; 2/21/92, .3 hours, review correspondence; 11/20/91, 1.8 hours, attention to representational issues."

Based on the foregoing, the Court reduces and disallows $2,082, or 30 percent of his time billed.

**i. Attorney 9:** As observed by the Fee Examiner, Attorney 9's billed time comprises 14 percent of the total fees requested during the first interim period. With 14 years' experience, she was the senior associate on this case, billing a total of $87,195, at rates between $250–$260 per hour. Because of the voluminous nature of the entries represented by her time sheets, the Court has only sampled discreet areas to gain an impression of the nature of Attorney 9's billing practices. In doing so, I determined that Attorney 9 spent significant amounts of time reviewing and revising documents prepared by other associates and paralegals, as well as performing tasks not commensurate with her senior status. For example, during the 60–day period from October 30, 1991 to December 30, 1991, she billed 11.3 hours on matters relating to extensions of time to file schedules and in conferring with paralegals about schedules preparation. During the same period, she spent 4.6 hours reviewing, revising, re-reviewing and re-revising an application to employ Stroock as counsel for the debtor. These tasks must be viewed in light of the extraordinary amounts of time spent by others on these same tasks (e.g., Attorney 3). In addition, while Attorney 9 carefully detailed the tasks in the smallest possible increments, many of her descriptions are vague

and uninformative—for example, "12/11/91, .1 hours, review and revise miscellaneous correspondence; 12/16/91, .1 hours, review various correspondence and instruct paralegal."

In reviewing her time sheets, the Court is reminded of the admonition of one court:

> This Court agrees with the Bankruptcy Court that courts should not "spend [ ] non-existent Court resources to track down every entry, correlate them against other fee applications, and delete those entries insufficiently substantiated." (citation omitted)

*In re Bank of New England Corp.,* 142 B.R. 584, 586 (D.Mass.1992).

The overall impression of Attorney 9's time sheets is one of significant over-involvement in matters which should have been delegated, and once delegated, left to the responsibility of junior associates and paralegals. As a result, the Court makes an overall reduction of 30 percent for hours billed in this period, or $26,158.50.

**j. Attorney 10:** The Court concurs with the Fee Examiner's questions regarding Attorney 10's participation. I disallow $67.50.

**k. Attorney 11:** The Court concurs with the Fee Examiner's characterization of time entries as vague. I disallow $260.

**l. Attorney 12:** Appropriate billing judgment should have been exercised regarding this inexperienced associate. She was not admitted to practice until after the time billed during this period. Her tasks were ones which could have been accomplished by paralegals—for example, "11/17/91, .4 hours, preparing change of attorney forms; 11/15/91, .4 hours, preparing and filing automatic stay notice." The Court reduces her time to that of a paralegal and disallows $150.

**m. Attorney 13:** The comments of the Fee Examiner concerning the difficulty of corroborating Attorney 13's time expended in conferring, attending meetings and the like, appear to be well-taken. In addition to the examples pointed out by the Fee Examiner in his report filed January 28, 1993, the Court's examination of Attorney 13's individual time entries found a similar pattern.

For example, on February 27, 1992, Attorney 13 reported 15 hours spent in attendance at meetings regarding various parcels of Maruko real estate. Mr. Arnold Quittner, senior partner on this case, recorded only 11.5 hours for engaging in the same activity. In addition, Attorney 13's time entries are replete with vague, non-specific descriptions—for example, "12/11/91, 2.2 hours, meeting with A. Quittner, et al. [no topic described]; 12/12/91, 3.7 hours, meeting with M. Masuda, etc. [no topic described]; 12/18/91, .6 hours, telephone conference with A. Quittner re various matters." There is also evidence of apparent duplicate billing—for example, "2/13/92, .4 hours, telephone conference with city attorney regarding taxes [two identical entries]." Finally, it appears that Attorney 13 spent significant amounts of time in conferences which may have assisted him in becoming familiar with the client to some degree, but did not appear to be for a specific legal purpose. Under § 330(a)(1), reasonable compensation is for "actual, necessary services". For example, on 1/9/92, Attorney 13 spent 12.7 hours in meetings with managers at hotels and touring hotel properties.

Based on the foregoing comments, the Court believes that an adjustment to the fees billed by Attorney 13 is appropriate and deducts $23,871 of his fees.

To the extent the Court has not addressed the time entries of other attorneys commented on by the Fee Examiner or the United States Trustee, the Court has reviewed those entries and found the entries or explanations acceptable. Turning to the question of paralegals and other para-professionals (e.g., librarian), both the Fee Examiner and the United States Trustee expressed concern that many of the services billed were clerical in nature and thus a non-reimbursable expense, according to U.S. Trustee Guideline C, which states:

> C. Non–Reimbursable Expenses: Absent extraordinary circumstances, the United States Trustee will object to the following as not actual, necessary expenses. . . .
>
> > 4. Normal overhead expenses such as rent, insurance, utilities, secretarial work, word processing, office supplies, docketing time, attending photocopy or

facsimile machines, "opening file", administrative expenses, and other similar internal operating or overhead expenses.

The Amendment to the United States Trustee's Objection to the Amended First Interim Application filed March 24, 1993, noted $43,849.50, in such charges. Stroock's response in its March 17 and April 30 submittals was to reduce charges in this category a total of $6,937.50. The United States Trustee persisted in her objections, Stroock responded on May 26, 1993, and further exchanges between the two continued on May 27, 1993, in open court, with the entire controversy devolving into a proceeding resembling haggling at a market. While the Court appreciates the substantial amount of time spent by Ms. Adrienne Coffin, now senior associate on the case (at $240 per hour), in attempting to address this issue, the Court is simply unable to track Stroock's confusing adjustments to each of the interim periods after its April 30 Supplement to Reply. Accordingly, the Court makes its own review of para-professional services in light of the United States Trustee's objections and the Fee Examiner's comments:

■ **n. Para-professional 1:** As observed by the Fee Examiner, 21 percent of the total time for all professionals and para-professionals, or 511.1 hours was billed by Para-professional 1 during this interim period. The examples given by the Fee Examiner of the vagueness of Para-professional 1's time entries are corroborated by the Court's own review of those entries—for example, "11/14/91, .2 hours, review correspondence; 1/13/92, 2.0 hours, review, analysis and organization of incoming pleadings and correspondence." As pointed out by Ms. Mary Testerman of the Office of the United States Trustee, "Time entries by some billers are so vague and undescriptive that it is impossible to determine whether the work performed was more than merely a clerical duty." (U.S. Trustee's Resp. to Reply, filed May 7, 1993, p. 4). Unfortunately, many of Para-professional 1's entries are susceptible to that criticism. The subsequent attempt to respond by handwritten annotations, circled entries, excised entries, arrows, etc., on the daily time sheets (Decl. of Coffin filed May 26, 1993),

leaves the Court with the impression of reviewing a diagram for a football play. The attempted *ad hoc* justification is simply incomprehensible. As observed by one court:

> The initial fee application, on its face, should be sufficient to satisfy the applicant's burden of proof. The initial fee application hearing was the proper forum for Coopers to present any evidence it wished the Bankruptcy Court to consider. (citation omitted)

*In re Bank of New England Corp.*, 142 B.R. at 588.

Para-professional 1's time records are also extraordinary for their inaccuracy. She was one of two people who billed in excess of 24 hours a day during these three interim periods, having done so three times. Although Stroock's March 17, 1993, Reply to Objections of United States Trustee deducts much of that time as attributable to duplicate entries, the Court's confidence in the accuracy of her time entries is low.

Based on the foregoing, the Court deducts $20,700 from time billed by Para-professional 1 during the first interim application.

■ **o. Para-professional 2:** The Court concurs with the question raised by the Fee Examiner why an estate would be billed for a librarian's services in pulling new bankruptcy cases. All of Para-professional 2's time billed to this case will be disallowed, or $104.

■ **p. Para-professional 3:** The Court concurs with the questions raised by the Fee Examiner concerning Para-professional 3's work in preparing schedules for the debtor. As noted by Mr. Brown, Para-professional 1 spent a significant portion of her time preparing schedules and Attorney 9 spent a substantial portion of her time reviewing and revising the same. There appears to be a significant duplication of efforts with respect to schedule preparation. Based on the comments of the Fee Examiner and the Court's own review of these time sheets, I deduct 25 percent, or $3,402 of Para-professional 3's time billed.

The overall reductions as discussed above total $94,501. For the first interim period, the Court makes an award of $385,461.50.

## B. EXPENSE REQUEST

### 1. Computer Research Services (Lexis/Westlaw Charges):

There is a division of authority on whether computer-assisted research is compensable. Some courts regard it as overhead. *See Bank of New England Corp.,* 134 B.R. at 456–457. The Court believes it is a compensable expense and accepts Stroock's explanation for a flat rate of $250/hour charge for the service. However, there is a potential for abuse in billing computer-assisted research, "... by inexperienced data base users who will read and/or copy the results of an over-broad search rather than refining it." *Id.* at 457. Of the $4,750 billed during the first interim period, 33 percent was billed by Attorney 3, whose fees were reduced by 77 percent because of the Court's perception of his inexperience and inefficiency. Additionally, as pointed out by Mr. Brown, $550 of the charges were billed by a person whose name does not even appear in the First Interim Application. Accordingly, the Court deducts $2,100 from the time charged to Westlaw/Lexis research.

### 2. Courier/Messenger Services:

As noted by Mr. Brown, the Fee Examiner, $6,898.77, or 13 percent of the total disbursements in this expense category were for Federal Express. This Court's actual experience in receiving pleadings from Stroock corroborates Mr. Brown's impression that the firm uses Federal Express on almost a daily basis for transmittal of documents. This Court concurs with the observation of Bankruptcy Judge William C. Hillman in *Bank of New England Corp., supra,* who stated:

> Express delivery charges of $3,446.05 are not allowed because the necessity for the expense is not demonstrated ... Not everything absolutely positively has to get there overnight, or quicker.

*Id.* at 467.

The Court disallows the charge in its entirety as the necessity for incurring the same has not been demonstrated, especially in view of significant facsimile charges.

### 3. Meals:

The United States Trustee cites OUST Guideline "A", page 2, Reimbursable Expenses, No. 9, as the basis for her objection to meals charges. The Court concurs that working meals claimed by a firm at which outside persons are not present are personal expenses and not "necessary" expenses. As stated by Ms. Testerman:

> In addition, to allow the firm to charge for intrafirm meals while an outside person is not present would provide no monitoring with regard to the meals billed to a bankruptcy estate. Thus, the firm could bill for every meal on every case and argue that the meal was a "necessary expense".

(U.S. Trustee's Resp. to Reply filed May 7, 1993, pp. 2–3).

*See, also,* discussion in *In re Bank of New England,* 134 B.R. at 457–58. The Court rejects Stroock's position announced in the March 17, 1993, Reply to Objections, that merely because it is its "standard practice" to bill Stroock's clients for working meals, they should be recovered as actual and necessary expenses. Other than the infamous Wildwings meal (which is the subject of the Reply, the Tolin Declaration and an exhibit), the Court disallows $620.28 in meals as insufficiently documented.

To the extent that other comments and objections to expenses have not been addressed, the Court has either reviewed the adjustments made by Stroock or the explanations, and found them acceptable.

Based on the foregoing, the Court reduces the expenses by $9,619.05 and awards expenses of $37,643.69 for the first interim period.

## II. SECOND INTERIM APPLICATION

For the second interim period of March 1, 1992 to July 31, 1992, the Stroock firm initially requested fees of $658,908.50, and costs of $58,569.36. In its March 17, 1993, Reply, the firm reduced the fees to $655,192.50. In its April 30, 1993, Supplement to Reply to Objections of the U.S. Trustee, etc., the firm once again reduced its fees, to $634,139. Generally, the fee reductions were in response to objections and/or comments questioning time entries properly characterized

as "clerical". In light of objections and/or comments, costs were reduced $78, to $58,-491.36.

## A. FEE REQUEST

■ The same comments concerning high hourly rates, transient billers and billing judgments made by the Fee Examiner in response to the First Interim Request were problems raised by him in reviewing the Second Interim Request. The same objections concerning improperly billed "clerical" time made by the United States Trustee to the First Interim Request were also made to the Second Interim Request. In addition, the Fee Examiner highlights an approximate $20,000 in billing entries relating almost exclusively to opposing the Court's appointment of a fee examiner.

■ Having spent at least 24 "honest hours" reviewing in detail daily time sheets and pleadings and corroborating each of the concerns expressed by the Fee Examiner or the United States Trustee about the first interim period billings, the Court considers a sufficient sampling has been made from which to extrapolate an applicable percentage to the fees requested by the Second and Third Interim Fee Applications, as the same problems are presented by each. In my view, the Court need not identify every insufficient or offending entry and each item disallowed with particularity. There are simply insufficient resources—even with the assistance of the Fee Examiner and the United States Trustee—for the Court to do so. *See In re Bank of New England Corp.*, 142 B.R. at 586–87.

The reductions in the First Interim Fee Application represented 25 percent of the fees requested as of the April 30, 1993, Supplement to Reply. That same percentage will be applied to the net fees requested for the Second Interim Fee Application, resulting in reduction of $163,798, and an award of fees of $495,110, for the second interim period.

## B. EXPENSE REQUEST

**1. Computer Research Services (Lexis/Westlaw Charges):**

■ The detail provided for the Lexis/Westlaw research conducted during the first interim period was not provided for research conducted during the second interim period. The exhibit to the Second Amended Fee Application of Stroock contains insufficient information for the Court to make a finding that the research is compensable. Accordingly, I disallow the entire charge, or $7,450.

**2. Courier/Messenger Services:**

■ The Court disallows the charge of $10,092.13, in its entirety, as the necessity for incurring the same has not been demonstrated, especially in view of significant facsimile charges.

**3. Meals:**

The Court disallows the charge of $577.07, in its entirety, for the same reasons expressed in paragraph I.B.3. above.

Based on the foregoing adjustments, the Court disallows $18,119.20, and awards $40,-450.16, in expense reimbursement for the second interim period.

## III. THIRD INTERIM APPLICATION

For the third interim period of August 1, 1992, to November 30, 1992, the Stroock firm initially requested fees of $388,978.50, and costs of $46,258.06. In its April 30, 1993, Supplement to Reply to Objections of the U.S. Trustee, etc., the firm reduced its fees to $382,257, in response to objections and/or comments questioning time entries properly characterized as "clerical".

## A. FEE REQUEST

■ The same concerns regarding transient billers and duplication of efforts by numerous associates and paralegals made by the Fee Examiner in response to the first and second interim requests were problems raised by him in reviewing the third interim request. The same objections concerning improperly billed clerical time made by the United States Trustee to the first and second interim requests were also made to the third

interim request. Applying criteria explained in paragraph II.A. above, I make a 25 percent reduction to the fees for this period, or $95,564, and award $286,693, in fees.

## B. EXPENSE REQUEST

### 1. Computer Research Services (Lexis/Westlaw Charges):

The detail provided for the Lexis/Westlaw research conducted during the first interim period was not provided for research conducted during the third interim period. The exhibit to the Third Amended Fee Application of Stroock contains insufficient information for the Court to make a finding that the research is compensable. Accordingly, I disallow the entire charge, or $1,650.

### 2. Courier/Messenger Services:

The Court disallows the charge of $7,457.57, in its entirety, as the necessity for incurring the same has not been demonstrated, especially in view of significant facsimile charges.

### 3. Meals:

The Court disallows charges of $521.26 in meals for the same reasons explained in paragraph I.B.3. above. Based on the foregoing adjustments, the Court disallows $9,628.83, and awards $36,629.23, in expense reimbursement for the third interim period.

As stated at the outset, these interim awards have not been reviewed in light of the Fee Examiner's comments concerning the high hourly rate. When Mr. Brown provides this information, I will make whatever additional adjustments as are appropriate. Additionally, in view of the reductions made in this Memorandum Decision, and which may be made at the final hearing on these fees, the Court declines the firm's invitation to revisit the merits of the 30 percent hold back now presently being taken on monthly disbursements to the firm.

Counsel for Stroock & Stroock & Lavan is directed to prepare an order in accordance with this Memorandum Decision within ten (10) days of its entry.