In re THRIFTY OIL COMPANY, a California corporation; Golden West Refining Company, a California corporation; CLUJ Distribution Company, a California corporation; and Golden West Distribution Company, a California corporation, Debtors.

Bankruptcy No. 92–09132–A11.

United States Bankruptcy Court, S.D. California.

Feb. 20, 1997.

Robert A. Greenfield, Isaac M. Pachulski, Stutman, Treister & Glatt, Los Angeles, CA, for Debtors and Debtors in Possession.

Tiffany L. Carroll, Office of the U.S. Trustee, Southern District of CA, San Diego, CA, United States Trustee.

Joel Ohlgren, Sheppard, Mullin, Richter & Hampton, Los Angeles, CA, for OCC.

Victor Vilaplana, Sheppard, Mullin, Richter & Hampton, San Diego, CA, for OCC.

Daniel M. Pelliccioni, Katten, Muchin, Zavis & Weitzman, Los Angeles, CA, Ronald L. Leibow, Kaye Scholer Fieman Hays, Los Angeles, CA, Union Bank, c/o Morrison & Foerster, Attn.: Lawrence Peitzman, Los Angeles, CA, Lucinda Dennis, Bronson, Bronson & McKinnon, Los Angeles, CA, for Creditor Bank of America.

M. Freddie Reiss, Price Waterhouse, Los Angeles, CA, Consultants & Accountants for OCC.

Leonard L. Gumport, Gumport, Rietman & Montgomery, Los Angeles, CA, for Debtor.

## MEMORANDUM DECISION

LOUISE DeCARL ADLER, Chief Judge.*

Thrifty Oil Company ("Thrifty") and its related entities, reorganized chapter 11 debtors, object to the eighth and final application for compensation and reimbursement of expenses filed by Price Waterhouse LLP ("PW") accountants to the Official Creditor's Committee ("OCC").

Evidentiary hearings were conducted on the PW application and a decision taken under submission for the reason that one of the grounds for objection—the lack of value to the OCC's proposed plan of reorganization—was common to both the application of PW

_____
* Formerly known as Louise DeCarl Malugen.

and that of Sheppard, Mullin, Richter & Hampton ("SMRH"), attorneys for the OCC. At issue in this fee application is the final allowance and award of fees and costs totalling $1,068,682.66.

## I. FACTUAL SUMMARY

Thrifty along with its subsidiaries Golden West Refining Company ("Refining"), Cluj Distribution Company and Golden West Distribution Company ("Distribution") filed petitions for relief under chapter 11 on July 31, 1992. The precipitating cause was the filing of complaints against Thrifty on a guarantee of an $80 million loan to Refining by a consortium of banks referred to as the "Bank Group". Refining failed to make an interest payment due on the loan because it had suspended refining operations for a variety of reasons including lack of profit and the enormous cost of environmental compliance. When Refining suspended operations, it deprived Distribution and Thrifty of their primary source of gasoline.

The United States trustee appointed Bank of America, lead bank in the Bank Group, and others to an OCC. By application filed October 1, 1992, the OCC sought employment of PW and set forth the "standard hourly rate" of a number of accountants and appraisers at PW by name. M. Freddie Reiss ("Reiss") was designated to be the "accountant with chief responsibility for the Engagement Management Team". *Ex Parte* Applic. for Authority to Employ Price Waterhouse at 5:16–17. James H. Dezart was to be the appraiser in charge of the Valuation Team.

The application was accompanied by the affidavit of disinterest of Reiss on behalf of himself and PW. In relevant part the affidavit stated:

7. To the best of my knowledge, neither I nor any member of Price Waterhouse represent any creditors of the bankruptcy estate in matters for which the firm is to be retained. Because of the nationwide and international nature of Price Waterhouse's operations, and the number of Thrifty's creditors, Price Waterhouse al-

most certainly provides services to individual creditors of Thrifty, but such services are unrelated to the services for which Price Waterhouse is to be retained. Price Waterhouse has and will continue to take its customary measures to protect the confidentiality of its clients. To the best of my knowledge, Price Waterhouse represents no interest adverse to the OCC.

Reiss' Aff. at 3:21–8, 4:1–4.

During the course of representing the OCC, PW took the following actions which form the bases of the debtors' objections to its fees:

1. PW raised its standard hourly rates in the Thrifty case.

2. PW represented Chevron Oil, a competitor of Thrifty, without disclosing this to the court.

3. PW failed to staff the engagement as represented in the application. Almost none of the accountants specially named in the employment application performed work for the OCC during the pendency of the Thrifty case.

4. PW together with OCC counsel, SMRH, during Thrifty's exclusivity period, "... embarked on a costly, extensive plan formulation effort that focused on a scheme to liquidate Thrifty." Thrifty Oil Co.'s Brief in Supp. of Obj. at 6:21–23. The OCC draft plan of reorganization was attached as an exhibit to the OCC's objection to Thrifty's motion for a third extension of exclusivity.

5. PW's fees incurred in representing the OCC were generally excessive. PW overstaffed the case, spent excessive time in reviewing and other criticisms which are all part of a report by Thrifty's fee examiner. The United States trustee concurs in some of these criticisms.

## II. DISCUSSION

The court will address each of the objections in the above-stated order.

### 1. Increases in Standard Hourly Rates:

PW increased its hourly rate charges during the course of this case. These rate increases cost the debtors an aggregate of $83,669.80. The debtors object that PW failed to support its hourly rate increases and prove that similar increases were charged to other clients.

Paragraph 8 of the employment application indicated that PW would bill the OCC at certain hourly rates denominated "standard". The phrase was footnoted to add the caveat, "in the event that Price Waterhouse increases its rates to all clients, the rates charged to the OCC will be similarly increased. Price Waterhouse shall give the OCC thirty (30) days notice in advance of such rate increases. Price Waterhouse is unaware of any contemplated rate increases at this time." *Ex Parte* Applic. for Authority to Employ Price Waterhouse at 5:27–28.

On cross-examination Reiss testified that whenever rates would change for PW—typically on April 1 of each year—notices would be sent to the OCC and filed with the court. No objection was made by any party to the rate increase.

The debtors object that PW has failed to prove similar rate increases to other clients. However, there is no evidence which even remotely rebuts Reiss' sworn testimony that the corporate recovery practice group has one set of rates standard to the department and all clients of that department are charged the same rates. Accordingly, the objection to increases in the standard hourly rates is **OVERRULED.**

### 2. Representation of Chevron Oil, a Competitor of Thrifty:

At the time the debtors' chapter 11 petitions were filed, Refining was involved in a lengthy arbitration with Chevron over the terms of the contract by which Refining purchased its facilities from Chevron with Chevron agreeing, in turn, to reimburse Refining for certain environmental clean-up costs. The debtors believed that Chevron owed Refining "millions and millions of dollars".[1] In

---

1. Ultimately Chevron did pay Refining/Thrifty $7 million in reimbursements. R.T. of 2/14/1996, 54:13–15.

other words, Chevron was not a creditor of the debtors but a debtor of the debtors. Additionally, Moshe Sassover, Thrifty's senior vice-president, testified that during the entire chapter 11 case and at the present time, Chevron is a direct competitor of Thrifty Oil. Reporter's Transcript ("R.T.") of 02/14/1996 at 52:24–5.

At the time PW was employed, Chevron was an audit client of PW although Reiss testified he had no awareness of this when PW became accountants for the OCC. Reiss testified that the conflicts check performed by PW was typically performed as to members of the OCC. R.T. of 01/29/1996 at 86:15–18. PW does not perform a conflicts check for parties with whom a debtor may be in litigation nor perform one for parties with whom a debtor may be in competition. Indeed, PW does not perform a conflicts check as to other creditors of a debtor who are not on the OCC. Reiss' explanation is:

> Price Waterhouse has 25,000 clients in the U.S. and abroad. Many of them may do business with every other company in the United States. I don't believe I have a duty to try and know every time a client of Price Waterhouse is involved in doing business or even in a dispute with the company. All I can say is if it is not a creditor or a member of the creditors' committee and we are not providing any services to them relating to a bankruptcy, then I have satisfied my requirements.

> . . . . .

> ... Most debtors don't have a list of all the litigation. They could have hundreds of slip and fall cases which might involve ordinary people who could be Price Waterhouse clients, they could be individuals. It is an impossible burden to establish that I know every single client of Price Waterhouse and every single one of them and each and every company they do business with.

R.T. of 1/29/96 at 88:10–18; 22–25, 89:1–3.

Although Sassover testified that he believed that it was in Chevron's interest to have Thrifty liquidated, he could point to no specific injury he believes flowed from PW's representation of the committee and Chevron. On cross-examination he admitted that some members of the OCC also held that view.

■ Bankruptcy Rule 2014(a) provides that an order approving employment of accountants for a creditor's committee may be made only upon an application which states: "... to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest ..." Although 11 U.S.C. section 1103(b) bars an accountant's employment by a committee while that accountant represents an adverse interest, what constitutes an adverse interest is not defined in the statute.[2]

■ This court rejects Reiss' simplistic view of what constitutes an adequate conflicts check. Merely reviewing client lists to determine whether PW represented any members of the OCC does not in this court's view provide PW with a safe harbor. An interest adverse to the debtor can arise from representation of others connected with the case or from those in litigation with the debtor as well. Neither is the size of PW an excuse for performing an adequate inquiry. As observed by one court:

> To ensure themselves no conflict existed with respect to related debtors, the duty was not solely limited to Coopers & Lybrand in Tampa, but was a duty of the whole organization of Coopers & Lybrand. Coopers & Lybrand had a duty to ensure themselves of no conflict with all departments and locations of its partnership.

*In re Trust America Service Corp.*, 175 B.R. 413, 420 (Bankr.M.D.Fla.1994). *See also, In re Lee Way Holding Co.*, 102 B.R. 616, 621 (S.D.Ohio 1988); *In re Blinder, Robinson & Co., Inc.*, 131 B.R. 872, 882 (D.Colo.1991).

---

**2.** A useful definition is that contained in *In re American Printers and Lithographers, Inc.*, 148 B.R. 862, 864 (Bankr.N.D.Ill.1992) which stated that an interest adverse to the estate is "any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute ..." An adverse interest includes a conflict of interest. *In re McNar, Inc.*, 116 B.R. 746, 750 (Bankr. S.D.Cal.1990). *See also, In re Leypoldt*, 1995 Westlaw 562183, *3 (Bankr.Idaho 1995).

Fortunately for PW, there is no evidence that performing Chevron's audits resulted in a conflict of interest with the debtors. Unlike the accountants in the *Trust America Service Corporation* case, it does not appear that the audits performed by PW for Chevron had any impact on the actual bankruptcy estate or assisted Chevron in any way in its dispute with the debtor. Accordingly, the objection to PW's fees on the failure to make disclosure of its representation of Chevron Oil, a competitor in litigation with the debtors, is **OVERRULED.**

### 3. Failure to Staff the Engagement as Represented in the Employment Application:

The debtors' objection on this ground is novel. In essence, the debtors complain that PW represented to the OCC and the court that certain senior personnel would be working on the case when, in fact, almost none of the persons identified in the application did so. The debtors believe that the failure to adequately staff the engagement with senior people having experience resulted in, "... a lot of managers and subordinates running around like chickens with their heads cut off, because they have no experience. They don't know what they are doing." R.T. of 01/29/96 at 80:6–8. The debtors complain that not only were the fees excessive as a result, but also PW misrepresented the staffing in order to become employed.

While the court will defer to a later point consideration of the debtors' complaint about excessive fees, the claim of misrepresentation must be addressed. PW's application to be employed listed seven accountants and appraisers by name, indicating their years of experience and standard hourly rates. It also stated that others might be called upon "to provide advice and analysis to the OCC at hourly rates comparable to the rates set forth above." *Ex Parte* Applic. for Authority to Employ Price Waterhouse at 5:10–12.

Interestingly, its solicitation letter to the OCC (Exhibit "B" to *Ex Parte* Applic.) was much more promotional in nature, touting the fact that the project team would be led by James H. Dezart ("Dezart"), "the Part-

ner-in-charge of the Western Region of our Valuation Services Group, with special expertise in the petroleum industry." It further represented, "the work will be completed using a team consisting of D. Richard Wincott, Kong E. Lee and John Boselli. These individuals have significant experience in the specialist type of valuation engagement proposed herein." PW Letter dated September 9, 1992. The September 9 letter was used as part of PW's presentation to the OCC to persuade it to hire PW as the OCC's accountants. As developed on cross-examination, Messrs. Wincott, Lee and Boselli never worked on the debtors' case and Mr. Dezart billed fewer than 25 hours on the entire case. Reiss' explanation was that by the time the OCC undertook valuation work, Dezart was no longer available.

PW's employment application does not represent to the court that the listed persons will be solely or even primarily responsible for performance of the engagement. This court is more concerned with the tone of the solicitation letter presented to the committee on September 9, 1992. Arguably, the OCC could feel aggrieved by what the debtors claim is a bait-and-switch tactic of touting the unique experience of certain individuals and then passing off the actual engagement onto lesser experienced people. However, the committee members who testified were satisfied with the staffing of the projects.

The testimony of Ms. Reuter, a vice-president of Bank of America and an OCC member, provides some insight into the need to change personnel during the engagement. She testified that the OCC initially asked PW to perform work in a number of different areas and when delegating the work to PW, "... would make sure that Price Waterhouse had an expertise to fully carry out the particular task prior to asking Price Waterhouse to complete it." R.T. of 01/29/96 at 37:24–5, 38:1. Apparently the committee would ask PW for information on a limited basis and then later expand the assignment by increments. Even Mr. Steven Stone, an OCC member who is somewhat critical of other aspects of PW's services, was generally approving of PW's work with the committee. The debtors have not produced one OCC

member who feels aggrieved by PW's substitution of personnel during the engagement. Accordingly, the objection based on a claim of misrepresentation will be **OVERRULED.**

### 4. The Ill–Fated OCC "Plan":

At what appears to be enormous expense to the estate, the OCC professionals—PW and SMRH, the OCC's counsel,—developed a draft plan of reorganization which was attached to the OCC's opposition to the debtors' third motion to extend plan exclusivity.

In broad terms, the OCC plan proposed creation of an entity known as New Thrifty to which all Thrifty assets would be transferred. New Thrifty had an obligation to pay some unsecured creditors in full with interest at 6% over prime which obligation was to be collateralized with a lien on New Thrifty's assets. If these unsecured creditors were not paid within three years of plan confirmation, New Thrifty would be liquidated to do so. Environmental claimants (unsecured creditors whose claims arose primarily from Refining's operations) would be classified as "Class 5–A" claimants who would receive notes from Refining and have a contingent claim against New Thrifty not to exceed a total value of $20 million. Under the OCC plan, New Thrifty would not provide Refining with the funds to cover its approximate $630,000/month operating losses. In other words, Refining would be forced into "cold shutdown" and its notes to the Class 5–A claimants would become valueless. Further, the OCC plan made no attempt to deal with the asserted IRS priority tax claim for $138 million.

Needless to say the OCC draft plan was a lightning rod for criticism. The debtors filed extensive opposition detailing the patent unconfirmability of a plan of this nature. Among other defects, the debtors pointed to the plan's unfair discrimination, failure to provide fair and equitable treatment and lack of feasibility. The California Department of Toxic Substances Control ("DTSC") strenuously objected to being limited to a $20 million clean-up trust to be shared with all other environmental claimants while other unsecured creditors would be paid in full with interest.[3] The DTSC complained bitterly that the OCC never consulted it nor any of the other environmental claimants before proposing its "plan".

After a contentious hearing on August 31, 1993, this court overruled the OCC's opposition to the debtors' request for an extension of exclusivity, finding that the debtors had presented ample cause to continue exclusivity. The court expressed strong reservations as to the merits of the OCC draft plan, stating that to terminate exclusivity in order to permit the filing of such a plan would bury the case in litigation.

This detailed synopsis of the OCC plan and reaction to it is necessary to put in context the debtors' objection to the award of any fees to PW or SMRH for this activity.[4] Michael Brown, the debtors' expert retained for the purpose of reviewing the PW and SMRH fee applications, identified $182,942 in time entries coded "PL" during the period December 1, 1992 to October 4, 1993 to which the debtors object. The task code PL came to be used as PW's method of recording work relating to the creation of the OCC's proposed plan of reorganization.[5] In addition to time recorded in the PL category, according to Brown and PW's prior fee applications, PW recorded the following plan-related work:

1. During the period of 10/06/92 to

---

3. Thrifty was also subject to claims from the California Regional Water Quality Control Board and other various state agencies for soil and groundwater contamination from Refining, from other state agencies for its role in the Huntington Beach oil spill, and from the California and U.S. Environmental Protection Agency for deposits of Hazardous Waste at the Casmalia Resources Landfill. DTSC estimated that the total amount of all environmental claimants would substantially exceed the $20 million clean-up trust fund.

4. SMRH's fee application is the subject of a separate memorandum decision.

5. Prior to 12/01/92 it appears that PW may have recorded work related to a proposed plan under the categories "VA" for valuation and "MO" for modeling. See, Declaration of Michael Brown filed September 29, 1995, at 20:23–8.

09/30/93,[6] $212,000.80 in the "VA" or valuation category.

2. During the period of 10/08/92 to 08/31/93, $3,169.50 in the "GS" or gasoline analysis category.

3. During the period of 10/19/92 to 08/31/93, $7,435.00 in the "SL" or station level analyses category.

PW's justification for performing these services is:

> Since the sale of the Debtor's assets was a possibility in any reorganization, PW began a valuation of these assets at the beginning of the case. This work was necessary for the formulation of a reorganization plan,....

Eighth Applic. of Price Waterhouse, LLP for Interim Compensation, *etc.*, filed May 1, 1995, at 21:20–24.

This explanation is disturbing. While liquidation is always a possibility, it was certainly not a probability at the early point at which plan formulation and valuation services were undertaken by PW on behalf of the OCC. Thrifty was enormously profitable during the course of the chapter 11 case and at most points was considered highly solvent.

The testimony of Steven Stone, an OCC member, provided some insight to the reasons PW and SMRH undertook these activities:

> A. My recollection in terms of the purpose of preparing the plan was to really leverage Thrifty Oil to produce their own plan in a more timely fashion within their exclusivity period ... it was the recommendation of the·professionals that this plan be produced and submitted.
>
> Q. Did the professionals say anything one way or the other as to whether or not it was ordinary or customary for a plan to be. prepared by a committee during the debtor's exclusivity period?
>
> A. I think the—or my recollection is that the real reason was to speed up the whole process and yet get Thrifty Oil to again produce and submit their own

plan. In other words, to move the process along. We had already been through—or in terms of the date they had filed, it had already been over a year, and there was some impatience. And we felt this would help really expedite and move that process along.

> Q. Was that a recommendation that the committee made to the professionals or the professionals made to the committee?
>
> A. The professionals recommended that to the committee.

R.T. of 02/14/96 at 45:6–25, 46:1–6.

While it is true that the debtors' reorganization proceeded somewhat slowly, the primary reason for delay was the significant environmental problems posed by Refining. Without reaching consensual clean-up. plans with the various environmental agencies, the debtors faced meeting these claims on an accelerated basis. Negotiations with the environmental agencies went slowly. When the plan was ultimately proposed by the debtors, it provided for the 100% payment of unsecured creditors' claims with interest but addressed environmental claims over a much longer time period through consensual clean-up plans negotiated by the debtors during the course of the chapter 11 case.

The actions of the OCC professionals raise a fundamental question: Just whom were they representing? Ms. Leslie Reuter, a Bank of America vice-president who served on Thrifty's OCC (Bank of America's guaranty claim against Thrifty was substantial) believed the OCC was representing all creditors:

> But in the long run it is the committee who has the fiduciary duty to represent all of its creditors and has to make its own decisions what it believes is the best course of action.

R.T. of 01/29/96 at 41:21–24.

However it appears the OCC professionals may not have fully appreciated the nature of the committee's fiduciary duty or advised them of the scope of that duty. In his decla-

---

6. The beginning and end dates of each category differ based on the court's own review and analysis of when OCC plan-related work ceased and other necessary work began.

ration, Michael Greenwald ("Greenwald"), an OCC member, stated:

> The Committee authorized Sheppard to prepare that plan, because Mr. Ohlgren of the Sheppard firm told us that we should do so. He did not tell us that we should first consult with environmental claimants, or that we had any duty to represent their interests, or that we should wait until after this Court ended Thrifty Oil's exclusive right to file a plan.
>
> * * * * * *
>
> Prior to the Committee's filing of its own plan in August 1993, the Committee was never advised that it represented environmental claimants, in addition to the Bank Group and trade creditors.

Exh. 3, Decl. of Michael Greenwald at 2:2–5; 22–24.

When cross-examined about this statement, Greenwald testified:

> When the Chevron [sic] and the other clean-up claimants who had never been to any meetings nor was I aware that there were such people, they popped—not that they popped up, but we were made aware that there were other claimants that were being represented by our committee that we had never seen or heard of up until that point. I can't tell you exactly the date of the meeting, but to the best of my recollection it was approximately in August of '93.

R.T. of 02/14/96 at 31:25, 32:1–7.

 PW defends its participation in preparation of the OCC draft plan by contending:

1. The court authorized these services.
2. The OCC asked for these services.
3. SMRH and not PW recommended this course of action.
4. These services were beneficial to the debtor as well.

Examining each of these contentions in order, the court will first dispense with the claim that the court authorized these services.[7] This claim appears to have its derivation in PW's application to be employed as OCC accountants and appraisers in which PW represented it would provide "valuation

services regarding real estate, petroleum stock, refining equipment, and other assets" and "services related to plan evaluation, negotiation and formulation · ..." *Ex Parte* Applic. for Authority to Employ Price Waterhouse at 4:5–9. However, any services rendered by PW pursuant to this court's order approving its employment was necessarily subject to review under section 330 and no court order can contravene the requirements of the statute. *See, In re Confections by Sandra, Inc.,* 83 B.R. 729, 733 (9th Cir. BAP 1987).

Second, the fact that the OCC requested PW's participation in the preparation of a draft plan is not tantamount to meeting section 330's requirements that those services be reasonable and necessary. The court could find no case holding that the proper focus for determining reasonableness of fees charged by professionals for an OCC is satisfaction of the committee members. Case law appears to be to the contrary. For example in *Unsecured Creditor's Committee vs. Puget Sound Plywood, Inc.,* 924 F.2d 955 (9th Cir. 1990) the court considered a debtor's objection to the proposed fees; there was no indication that members of the OCC were dissatisfied. Similarly, in *ICS Cybernetics, Inc.,* 97 B.R. 736 (Bankr.N.D.N.Y.1989) OCC members supported the fees requested by the professionals but the debtor and the U.S. trustee objected. Nevertheless, the court disallowed substantial fees. Finally, in the case of *In re Kenneth Leventhal & Co.,* 152 B.R. 511, 515 (Bankr.N.D.Ill.1993) the OCC accountants established that all the services they performed had been done at the direction of the committee. Notwithstanding this claim, the district court upheld the bankruptcy court's fee reduction, citing *In re Nucorp Energy, Inc.,* 764 F.2d 655, 658 (9th Cir.1985) for the proposition that the court has an independent duty to review fees for reasonableness and necessity even in the absence of objections.

Third, PW implies that the decision to prepare an OCC draft plan was one recommended by SMRH, the OCC's attorneys. On

---

7. PW's Reply to Thrifty's Obj. filed December 20, 1995 at 6:8–11; 26–28.

cross-examination of Steven Stone, PW's counsel developed the following:

Q. Mr. Stone, isn't it true that when you referred to the professionals that are recommending formulation of a plan, you are really talking about the attorneys for the committee?

A. That is correct.

R.T. of 02/14/96 at 46:13–16.

The court does not believe this "Nuremberg defense" protects PW's fees from being found either unreasonable or unnecessary. Further, this court is certain that PW does not wish to suggest that it has no independent professional duty to question the directives of either the OCC or its counsel before undertaking work which comprised almost 40% of the fees incurred by the firm in this case.

Fourth, PW claims that its services were beneficial to the debtor even though they were rendered in connection with the draft of an OCC plan. (R.T. of 01/29/96 at 64: 19–25, 65:1–10) Predictably, the debtor disputes this. The evidence is equivocal. Mr. Sanford Davis, a partner with Deloitte & Touche LLP, the auditors and tax accountants for Thrifty and Refining, declared:

Deloitte prepared valuations that were utilized by the Debtors in their successful plan of reorganization. Deloitte obviously reviewed, but did not use or rely upon the valuations prepared by Price Waterhouse.

Debtors' Exh. 2:1–3.

It is questionable whether services rendered by an OCC's professionals must be intended to benefit the debtor's estate. Although the Ninth Circuit in *Puget Sound Plywood* implied that "benefit to the estate" is a component of determining whether fees are "actual and necessary" (924 F.2d at 958), the context of that discussion bears consideration. In that case, the OCC's attorney's fees were incurred mainly in pursuit of highly contingent litigation which, if successful, would have resulted in a monetary recovery.

▇▇▇ Services of the type rendered by PW were not undertaken with an expectation of monetary benefit. Rather, they were rendered in furtherance of the OCC's duties under 11 U.S.C. § 1103(c)(2) and (3). As observed by one court, if monetary benefit to the estate were the sole measure of compensability, an OCC's professionals would be constantly placed in a conflict of interest; weighing whether taking a position adverse to the debtor will result in a denial of fees. *In re Lifschultz Fast Freight*, 140 B.R. 482, 486–88 (Bankr.N.D.Ill.1992). Further, strict application of a "benefit to the estate" test would produce an absurd result when the OCC's professionals were mainly engaged in efforts to allocate the limited assets of an estate in favor of its constituents. Certainly the overall estate is not benefited and yet championing the rights of the unsecured creditors is clearly a service for which the OCC's professionals should be compensated.

Perhaps the better approach to testing the "benefit" of services by an OCC's professional is to determine whether those services—even those in furtherance of the OCC's 1103(c) duties—were intended to increase the value of the return to the committee constituency and were reasonably anticipated to do so when rendered. Investigation of a debtor should not be undertaken unless it is reasonably believed necessary to achieve a benefit, avoid a loss, or assist in effective bargaining on the constituency's behalf. It should not be undertaken where it unnecessarily duplicates other services. By taking this approach to evaluating the "benefit" of services by an OCC's professionals, those professionals would be able to properly represent the committee without being concerned about monetary benefit to the estate.

▇▇▇ PW's fee request is one based on the lodestar principle. Under the application of that principle, the firm would be entitled to a fee equal to the hours worked multiplied by the hourly rate. *In re Yermakov*, 718 F.2d 1465, 1471 (9th Cir.1983). Adjustments to the fee calculated under lodestar may be made when the court does the evaluation required by 11 U.S.C. section 330. That evaluation includes asking the questions:

(1) Are the services which are the subject of the application properly compensable as legal [or accounting] services?

(2) If so, were they necessary and is the performance of the necessary tasks adequately documented?

(3) If so, how will they be valued? Were the necessary tasks performed within a reasonable amount of time and what is the reasonable value of that time? *Puget Sound Plywood, Inc.*, 924 F.2d at 957–58.

▮▮▮▮ In analyzing the PW fee request, the court will defer the questions of whether the services which are the subject of this application are properly compensable as accounting services or are reasonable in a discussion of the debtors' final objection that the fees are generally excessive. Addressing the second question of whether the fees were actual and necessary, it is difficult to strictly apply the *Puget Sound Plywood* analysis since there is no single service which PW undertook. In that case, the OCC's counsel billed over $21,000 in fees in pursuing litigation but recovered only $18,500 for the estate.

From the inception of this case, there was a high probability that Thrifty's creditors would be paid in full. That fact strongly supports an argument that none of the OCC professional fees in connection with plan preparation and the like were actual and necessary. The debtors had outstanding bankruptcy counsel and accountants and would have eventually proposed a plan. In essence, this is what the debtors argue. On the other hand, sections 1103(c)(2) and (3) contemplate an OCC taking more than just a passive role in a chapter 11 reorganization. However this is not a *carte blanche* to the OCC's professionals to run up fees which approximate those incurred by the debtor-in-possession. *Puget Sound Plywood*, 924 F.2d at 959. *See also, In re: Kenneth Leventhal & Co.*, 152 B.R. 511 (N.D.Ill.1993)

Although theoretically creditors may have benefited by "leveraging" the debtors into more promptly proposing a plan of reorganization, if the OCC had reasonable assurance of the debtors' intent and ability to propose a plan of reorganization, it should have limited its work to what was necessary to develop that plan and bring the case to a close. Here, it appears the converse was true. Until the court granted the debtors' third request for extension of exclusivity, overruling the OCC's objection, progress in the case appeared to be mired in bickering and accusations among the debtors, their secured creditors and the OCC. The court does not hold the OCC or its professionals entirely responsible for the level of hostility but merely observes that the cooperative relationship which should have been present given the likelihood of a 100% distribution to the unsecured creditors was absent.

Turning to the specific services, the court finds the services rendered in the PL or plan category from 12/01/92 to 10/04/93 totalling $182,942.00 were not reasonably necessary and must be disallowed. There was no correlation between the "draft plan" proposed by the OCC and that finally confirmed by the debtors other than the mere fact that creditors were to be paid in full under both plans. During the debtors' exclusivity period where there was a high probability of 100% distribution, efforts of the OCC to propose a plan as a leveraging tactic were, in the court's opinion, wasteful and unnecessary.

Additionally, services in the plan category should be disallowed because of the failure of the "draft plan" to treat *all* members of the OCC's constituency fairly. The OCC had a fiduciary duty to act in the best interests of all creditors and should have not used the vehicle of the draft plan to advance the interest of certain creditors. By itself, this is sufficient reason to disallow payment for these services. *See, In re Haskell–Dawes, Inc.*, 188 B.R. 515, 521 (Bankr.E.D.Pa.1995).

▮▮▮▮ The services recorded by PW in the VA or valuation category from 10/06/92 to 09/30/93 are found marginally necessary to the performance of the OCC's duties. This work was undertaken on the theory that the debtors' assets might have to be sold in order to effectuate a reorganization. Although the PW fee application repeatedly refers to the use of this work in "formulation of a reorganization plan", there is no showing that the debtors' professionals relied upon it in formulating the debtors' plan. The only other explanation is that it was work done in formulation of the OCC's "plan." This activity the court has already found was an unneces-

sary undertaking during the debtors' exclusivity period, given the unique circumstances of this case.

Similarly, other analyses performed by PW are described in the eighth and final fee application as related to the development of the OCC's "plan." The gasoline analysis category is described as PW's review, analysis and summary of retail gasoline statistics and gasoline pricing policies "... for use in the development of gasoline assumptions used in the preliminary plan of reorganization." Eighth Applic. of Price Waterhouse at 25:1–4. The station level analyses is work described as including "... the preparation of a five year forecasted profit and loss station level model used as an input in the development of the cash flow model for the preliminary plan of reorganization." Eighth Applic. of Price Waterhouse at 25:9–13. Again, the court finds this OCC plan related activity at best marginally necessary to the performance of the OCC's duties.

Section 1103(c)(2) permits the committee to investigate the financial condition of the debtor, its business operations and other matters relevant to plan formulation. During the early stages of this case, the debtors were admittedly reluctant to produce financial information, fearing loss of competitive advantages. Elaborate protocols was instituted under the sanction of court order to ensure OCC access to the information necessary to perform its investigative duties. There was never any suggestion that the work of debtors' accountants Deloitte & Touche was substandard or untrustworthy. Nor has the OCC shown convincingly that once confidentiality arrangements were in place, the debtors' accountants were unwilling to share valuations of Thrifty's gas stations and other assets. Further, as testified by Joel Ohlgren of SMRH,[8] the OCC's attorneys, the OCC was aware that Bank of America in its secured creditor capacity as a member of the Bank Group[9] was having Ernst & Young perform valuation work which they had agreed to share with the OCC. For these reasons, performing valuation work *ab initio* rather than randomly testing the hypotheses of the debtors' accountants or the Bank Group's accountants was a duplicative and wasteful exercise.

To the extent the work product assisted the OCC in performance of its discretionary section 1103(c)(2) duties, it may be found necessary. *See, In re Moseley,* 149 B.R. 458, 459 (Bankr.W.D.Ky.1993). Accordingly, the court will award 50% of the fees in the valuation, gasoline analysis and station level analyses categories. As set forth at page 13 of this decision, the fees in these categories total $222,605.30. The court will allow $111,302.65 as the reasonable value of the services. The balance will be disallowed as unnecessary and not reasonably incurred.

### 5. PW's Fees in Representing the OCC Were Generally Excessive.

The debtors' objections to PW's fees also include various criticisms which the court characterizes as an objection that PW's fees are excessive. *See generally,* Thrifty Oil Co.'s Brief in Supp. of Obj. filed September 29, 1995 at 19–22. Previously, in response to objections by the debtors and the United States trustee, the court deducted for excessive conferencing and billing for clerical services performed by a paraprofessional which were in the nature of overhead.[10] The previously withheld fees are as follows:

---

**8.** Testimony of Ohlgren, April 17, 1996, R.T. at 50:16–53:7.

**9.** Bank of America had two roles in this case. First, it was a secured creditor as part of the Bank Group at the Refining level. Second, it was a contingent unsecured creditor at the Thrifty level because of Thrifty's guarantee of Refining's Bank Group debt.

**10.** United States Trustee Guideline No. "A", Non–Reimbursable Expenses, No. 4 states as follows: absent extraordinary circumstances, the United States trustee will object to the following as not actual necessary expenses ...

. . . . .

4. Normal overhead expenses such as rent, insurance, utilities, secretarial work, word processing, office supplies, docketing time, tending photocopy or facsimile machines, 'opening file' administrative expenses, and other similar internal operating or overhead expenses.

| INTERIM FEE PERIOD | AMOUNT DISALLOWED | AMOUNT NOW REQUESTED |
|---|---|---|
| Second | $ 79,071.85 | $ 79,019.85 |
| Third | $ 25,228.30 | $ 25,149.30 |
| Fourth | $ 20,905.80 | $ 20,832.00 |
| Fifth | $ 23,761.87 | $ 21,149.85 |
| TOTAL | $148,967.82 | $146,451.00 |

In response to PW's request that virtually all amounts previously disallowed be restored, the United States trustee has filed a detailed analysis of objectionable entries totalling $30,356.00 for the second interim period, stating it has no objection to allowance of an additional $48,715.85 [11] (the difference between $79,071.85 and $30,356.00). As to amounts disallowed during the third, fourth and fifth interim periods, the United States trustee requests that my original rulings stand.

Predictably, the debtors do not want any of the prior disallowances for excessive conferencing and clerical tasks restored. The debtors' various objections relating to excessive fees are addressed as follows:

a. *Conferencing:* Mr. Brown's declaration in Support of Thrifty's Objection filed September 29, 1995 ("Brown Declaration") describes $89,545.70 spent in conferencing activity. Brown Decl. at 17–18. Unfortunately, the corroborating evidence at Exhibit 4, Tab "D" is not a helpful analysis. It includes internal conferences between or among PW personnel as well as external conferencing both by telephone and in person. It seems to include meetings with the debtors' representatives (*see*, entry of Moran, 10/08/92 and 10/14/92) and meetings with outside parties for purposes of gathering information about the debtors (*see*, entry of Grojean and Moran, 09/25/92 and 09/30/92; entry of Moran, 10/02/92).

The United States trustee's earlier objections and the court's earlier adjustments were directed primarily at excessive internal conferencing by the professionals of PW. After the fourth interim fee application, PW curbed multiple professionals billing for internal conferencing and billed external conferences with more than one member present only where that professional was necessary[12]. Accordingly, the court will make no additional reductions for excessive conferencing.

b. *Transient Billers:* In *In re Maruko, Inc.*, 160 B.R. 633, 639 (Bankr.S.D.Cal.1993), the court discussed the occurrence of "transient billing"—the practice of having an individual "visit the file on a limited basis" without accomplishing a discreet task and with no apparent continuing involvement with the matter. Mr. Brown's declaration discusses transient billing by PW and cites to Exhibit 4, Tab "C". Brown Decl. at 20. After reviewing these entries, the court declines to make further adjustments. Some of the entries are in the "PL" or "VA" category which has already been reduced by 50%. Other entries do appear to be related to a discreet

**11.** The court will diverge from the U.S. trustee's recommendation for the reason that all of the PL category time and 50% of the VA category time has already been disallowed at *supra*, p. 22–25. Were the court to follow the U.S. trustee's recommendation, double deductions would be taken for objectionable entries. Accordingly, the court will add to the amounts recommended for payment by the U.S. trustee $14,879.50 of PL time and $2,730.75 of VA time disallowed for other reasons.

**12.** *See*, Decl. of M. Freddie Reiss in Supp. of Price Waterhouse's Reply, filed December 20, 1995 at 15:26–28.

issue (*see, for example,* entries of V. Russo, 11/09/93—11/18/93).

c. *Duplication of Tasks:* The Brown Declaration cites to Exhibit 4, Tab "E" as support for the debtors' claim PW performed duplicative services. Brown Decl. at 17–18. As the court understands this analysis, Exhibit 4, Tab "E" is a further refinement of the conferencing category and is directed to meetings and conferences attended by more than one PW professional. The court's random sampling of these entries could not corroborate the claim that it is a listing of two people billing for the same task. For example, on 01/26/93, Redfield and Daniels apparently conferred but only Redfield billed for this. On the same date, Daniels conferred with Grojean but Grojean did not bill for the conference. If the exhibit was intended to show only one of multiple professionals participating in a conference, it does not clearly so indicate. Finally, many of the claimed duplicative entries have been the subject of reductions already (*see, for example,* "PL" entries pages 34–60 and "VA" entries pages 63–72). Further reductions are unwarranted.

d. *Review:* The Brown Declaration alludes to the recurring problem of "review" entries. Brown Decl. at 18–19. As Mr. Brown states:

> ... many of the PW time entries simply identify the 'review' of a document or a report, without ever identifying the purpose of the review, or what activity, if any, was connected with the review. My concern is that in a matter involving significant documents, it is very easy for a biller to simply record time for 'reviewing' something.

Decl. at 18:25, 19:1–6.

Exhibit 4, Tab "G" identifies over 700 transactions and over $153,000.00 in bills in which "reviewing" is a component of the charge. The court has reviewed the cited entries and determined that many of the them are in the "PL" category which has been disallowed in full or in the other plan-related categories which have been adjusted. Accordingly, the recommended 10% overall reduction would be an excessive adjustment.

e. *Clerical Tasks:* Echoing the U.S. trustee's concerns, the debtors are critical of tasks which are clerical in nature and should be billed as part of PW's administrative or overhead expense. The Brown Declaration at pages 26–27 describes two categories of services which are described in further detail at Exhibits 5, Tab "J", and Exhibit 5, Tab "K". Entries totalling $60,446.30 are cited in these categories.

Very limited adjustments will be made in response to this objection. The court has previously made reductions for services deemed clerical in nature during the third and fourth interim application periods. Further, the United States trustee has at the court's request concluded an analysis of the second interim application and the court will make adjustments in response to that analysis.

In reviewing the remaining application periods (the first and the sixth through the eighth), the court finds there are some instances of tasks which are clearly clerical (*see, for example,* Exh. 5, Tab "J" entry of Fong on 04/05/94). Other entries are not (*see, for example,* Exh. 5, Tab "J" entry of Grojean on 11/16/92; entry of Fong on 07/18/94).

Of the $17,050.40 in fees remaining to be reviewed, the court is satisfied that a reduction of an additional 10% or $1,705.00 is sufficient to adjust for those instances in which clerical entries were improperly billed.

f. *Other Objections:* The debtors have raised other objections concerning the excessive amount of time spent by PW on fee applications and monthly billing statements, on environmental issues, and on data input charges. The court does not agree with the debtors' criticisms and declines to make further adjustments to these categories.

### III. CONCLUSION

PW has requested final allowance of fees and costs totalling $1,068,682.66. By virtue of rulings within this memorandum decision, certain deductions will be made from the final award. They are as follows:

1. $182,942.00 of services in the PL or plan category.

2. $106,000.40 in the VA or valuation category.

3. $1,584.75 in the GS or gasoline analysis category.

4. $3,717.50 in the SL or station level analyses category.

5. $12,693.75 will be disallowed as non-reimbursable clerical or overhead expense or excessive internal conferencing during the second interim fee period.

6. Previous disallowances of $25,228.30, $20,905.80 and $23,761.87 as non-reimbursable clerical or overhead expense or excessive internal conferencing in the third, fourth and fifth interim periods will be reaffirmed with one exception. The deduction of $15,088.35 for time spent during the third interim period in excessive conferencing will be restored. This time has already been deducted in the "PL" and "VA" categories and this adjustment eliminates a double-deduction.

7. $1,705.00 will be disallowed as non-reimbursable expenses in the nature of clerical or overhead for the first and sixth through eighth application periods.

Fees and costs of $705,231.64 will be allowed as final compensation for PW's services. Counsel for the debtors is directed to prepare and lodge an order in accordance with this Memorandum Decision within ten (10) days of the date of entry.